## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| KRISTY DUMONT; DANA DUMONT; ERIN BUSK-SUTTON; REBECCA BUSK-SUTTON; and JENNIFER LUDOLPH, <br><br>            Plaintiffs, <br><br>        v. <br><br> NICK LYON, in his official capacity as the Director of the Michigan Department of Health and Human Services; and HERMAN MCCALL, in his official capacity as the Executive Director of the Michigan Children's Services Agency, <br><br>            Defendants. | Civil Action No.: <br><br><br><br> **COMPLAINT** |

## INTRODUCTION

1.     Plaintiffs bring this complaint to challenge Defendants' practice of permitting state-contracted and taxpayer-funded child placing agencies to use religious criteria to screen prospective foster and adoptive parents for children in the foster care system and to turn away qualified families on the basis of sexual orientation.  This practice harms vulnerable children by denying them access to loving families that they desperately need and violates the Establishment and Equal Protection Clauses of the United States Constitution.  This action does not in any way challenge the right of any private child placing agency to practice its religion, but when the State of Michigan (the "State") hires private child placing agencies to provide child welfare services for children

in state custody, it must ensure that those services are provided based on the needs of the children and in accordance with the United States Constitution.

2.      The Michigan Department of Health and Human Services ("DHHS") is responsible for the approximately 13,000 children who are in the State's foster care system because they have been removed from their families by the State due to abuse or neglect or otherwise became wards of the State.  Among the State's responsibilities to these children is finding appropriate foster and adoptive families to care for them.

3.      DHHS has chosen to contract out public adoption and foster care services to private agencies and pays these agencies with taxpayer funds to perform this government function.  Some of these agencies refuse to accept prospective families headed by same-sex couples or to place children with same-sex parent families due to the agencies' religious objections to such families.  DHHS is aware that these agencies are turning away these potentially qualified families solely for religious reasons but DHHS has not stopped them from engaging in this conduct.

4.      By statute, the State is responsible for the care of the children who are in Michigan's foster care system, and the State can neither categorically turn away gay and lesbian prospective parents nor use religious criteria in making decisions related to child welfare.  When the State delegates its statutory child-welfare responsibilities to private agencies, those private agencies must execute their state-contracted responsibilities subject to the same requirements applicable to the State.

5.      Plaintiffs Kristy and Dana Dumont and Erin and Rebecca Busk-Sutton are two prospective adoptive families that were turned away by state-contracted and

taxpayer-funded child placing agencies based on those agencies' religious objections to same-sex couples. These couples are ready, willing, and able to provide a "forever family" to children in the foster care system.

6.      Plaintiff Jennifer Ludolph was in the Michigan foster care system when she was a teenager. As a taxpayer, she objects to her taxpayer dollars funding child-placing agencies that make it even harder for foster children to find families by turning away loving and qualified families simply because of the agencies' religious objections to those families.

7.      All Plaintiffs are Michigan taxpayers who object to their taxpayer dollars being used to pay for public child welfare services that are provided based on religious standards rather than professional child welfare standards. And all Plaintiffs object to the use of taxpayer funds to underwrite and endorse religious beliefs to which they do not subscribe.

8.      This action concerns only the State's provision of taxpayer-funded government services based on religious and discriminatory criteria. It does not challenge any private agency's provision of private adoption services or use of non-public funds.

9.      DHHS itself could not deny children in the foster care system access to qualified prospective foster and adoptive parents based on religious criteria. For example, DHHS could not reject applicants on the basis of a religious objection to placing children with non-Christian, single-parent or same-sex parent families. Nor could DHHS refuse to accept prospective foster and adoptive parents on the basis of sexual orientation. The same is true when the State delegates this government function to

private agencies and pays them with taxpayer dollars.  In other words, private agencies performing a public function with taxpayer dollars and under contract with the State cannot perform actions that would be unconstitutional if performed directly by the State.

10.     The Establishment Clause of the First Amendment bars the State from providing or refusing to provide government services, such as the care of children in the foster care system, based on religious criteria.  The Establishment Clause also prohibits the State from delegating a government function to religious organizations and then allowing those organizations to perform that government function pursuant to religious criteria.

11.     The State's practice of funding and contracting with private religious organizations that use religious criteria to screen potential foster and adoption applicants is not a permissible accommodation of religion because it fails to take adequate account of the burdens imposed on children—specifically, the children whom the State hires these agencies to serve.  The State's practice of allowing religious-based exclusions of prospective foster and adoptive parents reduces placement options for the most vulnerable children.  As a result, some children may be placed with families that are less well-suited to meet their needs, some children may be separated from siblings and some children may age out of foster care without ever becoming part of a family.

12.     Moreover, the Equal Protection Clause of the Fourteenth Amendment prohibits the State from discriminating on the basis of sexual orientation through instrumentalities of the State.

13.     Accordingly, Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 and seek declaratory and injunctive relief directing officials of DHHS and its sub-agency, the Children's Services Agency ("CSA"), to ensure that private child placing agencies that are contracted by the State and funded with tax dollars to provide adoption and foster care services to children, do not turn away same-sex couples or other potentially qualified families based on religious eligibility criteria.

## JURISDICTION AND VENUE

14.     This is an action for declaratory and injunctive relief to enforce the constitutional rights of Plaintiffs under the First and Fourteenth Amendments of the United States Constitution.

15.     This Court has subject matter jurisdiction over Plaintiffs' claims arising under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983 pursuant to 28 U.S.C. § 1331 (general federal question jurisdiction) and § 1343 (civil rights actions).

16.     This Court has personal jurisdiction over Defendants because all Defendants are located, domiciled or incorporated in, or otherwise are present and conducting a continuous and systematic part of their general business within, the State.

17.     This Court has jurisdiction to render the declaratory relief requested under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

18.     Venue is proper in this district under 28 U.S.C. § 1391(b) because Plaintiffs Erin and Rebecca Busk-Sutton and Jennifer Ludolph reside in this district, DHHS

operates branch offices in this district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**PARTIES**

19.     Plaintiffs Kristy and Dana Dumont are married and reside in Dimondale, Michigan.  They desire to adopt children from the public foster care system and have been turned away by taxpayer-funded child placing agencies working under contract with the State due to religious objections to working with same-sex couples.  At all relevant times, Kristy and Dana Dumont have been, and continue to be, taxpayers of the State of Michigan.

20.     Plaintiffs Erin and Rebecca Busk-Sutton are married and reside in Detroit, Michigan.  They also desire to adopt children from the public foster care system and have been turned away by taxpayer-funded child placing agencies working under contract with the State due to those agencies' religious objections to working with same-sex couples. At all relevant times, Erin and Rebecca Busk-Sutton have been, and continue to be, taxpayers of the State of Michigan.

21.     Plaintiff Jennifer Ludolph is a resident of Detroit, Michigan.  She has been, and continues to be, a taxpayer of the State of Michigan.

22.     Defendant Nick Lyon is the Director of DHHS, the State agency responsible for foster care and adoption services for children in state custody.  DHHS contracts with private child placing agencies, such as Bethany Christian Services ("Bethany") and Catholic Charities, to provide public foster care and adoption services.

DHHS has its central offices in Lansing, Michigan, and operates branch offices in each of Michigan's 83 counties.

23.     Defendant Herman McCall is the Executive Director of CSA, a sub-agency of DHHS that, in addition to having oversight over the work of taxpayer-funded state-contracted child placing agencies, is mandated by law to "[r]eview, investigate, evaluate, and assess all programs within [DHHS] related to services and programs for children," including by advising on policy related to "children's services and programs including, but not limited to, services for foster children, juvenile justice, and homeless youth." Mich. Comp. L. § 400.227.

## FACTS GIVING RISE TO THIS ACTION

### A.     Michigan's Child Welfare System

24.     DHHS is responsible for all children in the Michigan foster care system.  A child's case with DHHS typically starts after Child Protective Services removes the child from his or her family for abuse or neglect and a court orders that the child be placed into foster care.  If a child ultimately cannot be reunited with his or her parents despite the provision of services to the parents and the parents' parental rights are terminated, DHHS seeks to find a permanent family for the child, typically through adoption.  DHHS's responsibilities for children who come into its care include recruiting and identifying appropriate families to care for these children either temporarily as foster parents until the children can be reunited with their families or permanently as with adoptive families.

25.     DHHS performs this public function in part by contracting with private agencies that are licensed by DHHS's Division of Child Welfare Licensing ("DCWL") as

"child placing agencies" to recruit, screen, train and license prospective foster and adoptive parents and to place children in appropriate foster or adoptive homes, as authorized by Michigan statute. *See* Mich. Comp. L. §§ 722.11(1)(c), 722.115(3), 722.922. Although DHHS retains ultimate supervisory responsibility in all cases, much of the on-the-ground foster care and adoption work is performed by taxpayer-funded child placing agencies.

26.     Through rulemaking authorized by statute, DHHS has conferred authority on private child placing agencies to make decisions regarding licensing foster parents and certifying adoptive parents, as well as the placement of children into foster and adoptive homes. *See* Mich. Admin. Code R. 400.12301(1), 400.12701. With this authority comes the obligation of child placing agencies to maintain ongoing recruitment programs "to ensure an adequate number of suitable and qualified homes" to meet the needs of children served by the agency. *Id.* R. 400.12304(1), 400.12706. The rules also give the agencies substantial discretion in evaluating applicants for foster homes or adoptive parents, *id.* R. 400.12310, 400.12605, as well as selecting an appropriate placement for a child into a foster or adoptive home, *id.* R. 400.12404, 400.12709.

27.     After an agency accepts a child's case from DHHS, it immediately begins receiving per diem compensation from the State. For example, some agencies receive at least $40 per day from the State for each adoption case that they handle. These per diem payments cease after a certain amount of time or when the child is permanently placed. The agencies also receive a lump-sum payment after placement, depending upon the outcome of the case.

28. To fund the state's child welfare system, the Michigan legislature annually makes appropriations for adoption and foster care services. With these appropriated funds, DHHS pays private child placing agencies under contract with the State to provide foster care and adoptive services.

29. DHHS has entered into adoption and foster care service contracts with more than 100 private child placing agencies statewide, and many of these agencies operate in multiple counties.

30. Many of the private child placing agencies under contract with the State are religiously affiliated.

31. The contracts entered into between DHHS and child placing agencies require the contracting agencies to comply with DHHS's non-discrimination statement, which mandates that agencies "will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs or disability." This requirement "applies to all applications filed for adoption of [DHHS] supervised children, including [DHHS] supervised children assigned to a contracted agency."

32. The contracts entered into between DHHS and child placing agencies also require each contracting agency to "develop and implement a plan for adoptive home recruitment, retention, and support consistent with" DHHS's licensing standards applicable to the agency's license.

33. Families interested in fostering or adopting a child out of the foster care system must submit an application for a foster care license or to be certified to adopt.

34.     Upon information and belief, each private child placing agency maintains a roster of families that it has licensed or certified that it generally uses for family placements for children assigned to its care.

35.     The eligibility requirements for families interested in adopting children from the foster care system are provided in the DHHS Adoption Program Statement, also known as Publication 255.  According to the Adoption Program Statement, DHHS "will not discriminate against any individual or group because of race, religion, age, national origin, color, height, weight, marital status, sex, sexual orientation, gender identity or expression, political beliefs or disability."  The Adoption Program Statement also states that "[t]he eligibility criteria for adoption of [DHHS]-supervised wards must not be more restrictive than the criteria in DHS Publication 255 when a contracted adoption agency is providing DHS adoption services."

36.     DHHS is contractually entitled to terminate its agreement with a child placing agency if the agency "[e]ngages in any conduct that may expose [DHHS] to liability" or "fails to cure a breach" of the agreement after receiving notice.  The contracts also provide DHHS the right to "immediately terminate this Agreement in whole or in part without penalty and for any reason."

37.     Nonetheless, although it is aware of certain child placing agencies' refusal to accept same-sex couples to foster or adopt children in the child welfare system, upon information and belief, DHHS has not taken any remedial action under its contracts against any private child placing agency for failure to comply with the DHHS non-discrimination statement, DHHS Publication 255, or the United States Constitution.

### B.    2015 Michigan House Bills Nos. 4188, 4189, and 4190

38.    For years, some private agencies providing foster care and adoption services under contract with the State have refused to accept same-sex couples as foster or adoptive parents because of the agencies' religious beliefs.

39.    Starting as early as 2013, members of the Michigan legislature attempted to introduce legislation that would codify and authorize the practice of permitting agencies to turn away same-sex couples on the basis of the agencies' religious objection.  The purpose of this legislation was clear.  At that time, marriage for same-sex couples had been legalized in many states and some state governments, over the objection of some religiously affiliated child placing agencies, had introduced rules requiring taxpayer-funded and state-contracted agencies providing public foster care and adoption services to accept adoption and foster care applications from same-sex couples on equal terms as different-sex couples.

40.    In 2013, the Families, Children and Seniors Committee of the Michigan House of Representatives considered a package of three bills, House Bills 4927, 4928, and 4991, which would preclude any state or local agency from taking "adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide services that conflict with the child placing agency's sincerely held religious beliefs."

41.    In discussions before the Michigan House Families, Children and Seniors Committee, the lead sponsor of the package reportedly stated that the goal of these bills

was to codify DHHS's practices related to entering into contracts for foster care and adoption case management services with private child placing agencies.

42.     Those bills did not pass, but the effort to encode State policy and practices delegating decision-making power over child welfare services to organizations acting pursuant to religious criteria and providing protection to private agencies discriminating on the basis of sexual orientation was reprised in the 2015-2016 legislative session with Michigan House Bills 4188, 4189, and 4190.

43.     During a hearing before the House on the bills on February 18, 2015, the director of clinical services at St. Vincent Catholic Charities confirmed that the organization would not work with gay and lesbian prospective parents, explaining that when prospective parents to whom they were religiously opposed approached them: "If they let us know that they're unmarried, or they're gay or lesbian, we immediately recommend, make a referral to another agency."

44.     The Michigan House of Representatives passed the bills in March 2015.

45.     In support of the bills, some religiously affiliated child placing agencies communicated with Michigan Governor Rick Snyder.  A letter from the President of Bethany asserted that to require Bethany to adhere to principles of non-discrimination would present them with "an untenable choice" of "choos[ing] between their desire to help children and families and their fidelity to their religious principles."  He stated further that "House Bills 4188–4190 are necessary" to "codify into state law what has been in practice," and threatened that "if statewide policy changes in a way that would

force Catholic agencies to choose between violating strongly held religious beliefs or ceasing cooperation with the state, the agencies will cease to cooperate."

46.     The President and CEO of the Michigan Catholic Conference also weighed in by letter to the Governor.  He stated that Catholic agencies "handl[e] approximately twenty percent of the active foster care and adoption cases in Michigan," and then went on to say that, "with profound concern and a sense of urgency," he was concerned that there were objections to "the religious manner by which faith-based child placement agencies operate."

47.     On June 10, 2015, the Michigan Senate passed the bills, and the following morning, Governor Snyder signed the bills into law as 2015 Public Acts 53, 54, and 55, codified in Michigan Compiled Laws 400.5a, 722.124e, 722.124f, and 710.23g.

48.      The statutes provide in relevant part that, "[t]o the fullest extent permitted by state and federal law, a child placing agency shall not be required to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs."  Mich. Comp. L. § 722.124e(2).  Additionally, the statutes provide that, "[t]o the fullest extent permitted by state and federal law, the state or a local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide any services that conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs."  *Id.* § 722.124e(3).  Under the statute, "services" are defined to "include[] any

service that a child placing agency provides, except foster care case management and adoption services provided under a contract with [DHHS]." *Id.* § 722.124e(7)(b).

49.     Some child placing agencies, including Bethany and Catholic Charities, appear to interpret these statutes as permitting taxpayer-funded state-contracted child placing agencies to turn away prospective families for children in foster care based on religious criteria.

50.     In a July 2016 letter to the Michigan Attorney General's office, counsel for Plaintiffs explained that they had received reports that some religiously affiliated taxpayer-funded state-contracted child placing agencies refused to accept same-sex couples who contacted them inquiring about adopting a child from foster care. Counsel for Plaintiffs requested a meeting to clarify the State's position with respect to such practices. However, the Attorney General's office refused to meet, and it did not disclaim the practice.

**C.     Defendants' Authorization of Religious-Based Exclusions by Child Placing Agencies Harms Children.**

51.     There is a shortage of foster and adoptive families in Michigan.

52.     As a result of that shortage, some children in State custody have and may continue to have multiple temporary placements before a suitable permanent home is found; other children have been and may continue to be separated from their siblings or placed in foster homes far from their school and community; some other children have been and may continue to be placed in group homes; and still other children have been

and may continue to be unable to be adopted at all and have and will instead reach the age of majority without ever being placed with a permanent family.

53.     Each time a prospective parent who is able to provide a loving and caring family for a child is turned away by a child placing agency because of a religious objection to their sexual orientation (or any other religious objection), the pool of families available for the children in the child welfare system diminishes, reducing children's options for an appropriate placement, or any placement at all.

54.     Every major professional organization dedicated to children's welfare, including the Child Welfare League of America, the National Association of Social Workers, the National Adoption Center, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Academy of Pediatrics, and the American Medical Association, affirmatively states that gay and lesbian parents are as likely as heterosexual parents to provide supportive and healthy environments for their children and opposes any discrimination based on sexual orientation in matters of adoption and foster care.

55.     The loss of potentially qualified families exacerbates this shortage and means some children will remain in foster care longer than necessary before being adopted into the security of a "forever family" and the State will spend more taxpayer dollars to care for them.

56.     Even if there were an abundance of families willing and able to care for children in the foster care system, the religious-based exclusion of capable families means some children may be denied the family that is best matched to meet their

individual needs.  Placing children is not a one-size-fits-all endeavor, as every child has unique needs and every family brings different qualities.  Unsuitable matches are less likely to be successful, and can lead to children being subjected to the instability of multiple placements.

### D.  Plaintiffs' Interest in Challenging DHHS's Practices

*Kristy and Dana Dumont*

57.  Plaintiffs Kristy and Dana Dumont have been together as a committed couple for 11 years.  They married in 2011.

58.  Kristy works at Michigan State University in the College of Education advising students.  She is also working on her Ph.D. in Higher Adult and Lifelong Education.  Dana works in the Michigan Department of Natural Resources.

59.  Kristy and Dana would like to adopt a child from the foster care system. The reason they are pursuing adoption through foster care is that they want to give a permanent home to a child who needs one.

60.  Kristy and Dana hope to adopt a child in foster care who may have difficulty finding a family.  Kristy and Dana recently moved to the village of Dimondale because of its high-quality school district; there, they live in a home with a yard and extra bedrooms in the anticipation of children.

61.  In July 2016, Kristy called St. Vincent's Catholic Charities in Lansing and said that she and her wife were interested adopting a child from foster care.  She was told that the agency does not work with same-sex couples.

62.     Kristy tried calling St. Vincent's Catholic Charities again in March  2017. She told the person who answered the phone that she was calling to inquire about adopting a child from foster care and was transferred to the voicemail of someone in the child welfare department.  Kristy left a detailed message explaining that she had previously been told that the agency did not work with same-sex couples, and asking if that was still the case.  She did not get a return call.

63.     Also in March  2017, Kristy called Bethany in Lansing and said that she and her wife were interested in adopting a child from the foster care system.  The Bethany representative told Kristy that Bethany does not work with same-sex couples.

64.     Kristy and Dana are Michigan taxpayers who object to the use of taxpayer funds to underwrite and endorse religious beliefs to which they do not subscribe.

### Erin and Rebecca Busk-Sutton

65.     Plaintiffs Erin and Rebecca Busk-Sutton have been together as a committed couple for eight years.  They married in 2014.

66.     Erin works with children helping them study and prepare for standardized tests and Rebecca is a resident physician in internal medicine.

67.     Erin and Rebecca would like to adopt a child from the foster care system. They are especially interested in adopting an older child or LGBT young person who may have difficulty finding a supportive family.  Erin wants to use her skills as an educator to potentially assist a foster youth who may have gaps in his or her education.

68.     On May 5, 2017, Erin called Bethany in Madison Heights and told the representative that she and her wife were interested in adopting a child from the foster

care system.  The Bethany representative told Erin that same-sex couples "aren't our area of expertise" and offered to recommend a different child placing agency in Sterling Heights or Ann Arbor.  Erin told the Bethany representative that those locations were far away and asked if Bethany would be willing to work with them.  The Bethany representative responded again that "same-sex couples aren't our area of expertise" and that she "didn't think they would have a good experience with [Bethany]."

69.     Erin and Rebecca are also Michigan taxpayers who object to the use of taxpayer funds to underwrite and endorse religious beliefs to which they do not subscribe.

**Jennifer Ludolph**

70.     Jennifer Ludolph is 33 years old and lives in Detroit.  She works as a pharmacy technician at the University of Michigan's hospital in Ann Arbor.

71.     At the age of 13, Jennifer and her siblings were removed from their parents' care and placed into the Michigan foster care system.  After four years of instability, at age 17 she was placed with a loving couple that provided a stable home for her and three of her siblings.  She feels lucky that she and her siblings landed in such a devoted and nurturing family that enabled them to thrive.

72.     Jennifer now has children of her own and has also served as a foster parent.

73.     Jennifer is strongly opposed to the State allowing taxpayer-funded child placing agencies hired by the state to care for children in foster care to turn away prospective foster and adoption families based on religious criteria.  She believes that such practices could have prevented her from finding her family because her foster father is an atheist.  She cares about the children currently in the foster care system who might

not be placed with a loving family because suitable prospective parents are turned away for religious reasons.

74.    Jennifer is a Michigan taxpayer and objects to the use of taxpayer funds to underwrite and endorse religious beliefs to which she does not subscribe.

## CLAIMS FOR RELIEF

### COUNT I
### First Amendment to the United States Constitution

75.    Plaintiffs reincorporate the allegations in paragraphs 1 to 74 as if fully set forth herein.

76.    DHHS has delegated to religious organizations the public function of managing foster care and adoption cases for children in Michigan's foster care system, which includes the responsibilities of recruiting and screening foster and adoptive parents and making family placements for the children the State assigns into their care.

77.    DHHS pays these religious organizations with public funds for the adoption and foster care work they perform.

78.    DHHS permits these taxpayer-funded and state-contracted religious organizations to use religious eligibility criteria when screening prospective foster and adoptive families and making placement decisions for children and DHHS is aware that some of these agencies are turning away prospective families headed by same-sex couples because of religious objections.

79.    DHHS's actions harm children in the foster care system by denying them access to needed families and result in discrimination against same-sex couples like

Plaintiffs Kristy and Dana Dumont and Erin and Rebecca Busk-Sutton. Plaintiffs collectively are harmed by the use of taxpayer funds to underwrite and endorse religious beliefs to which they do not subscribe.

80.     DHHS's conduct described above has deprived and continues to deprive Plaintiffs of their rights protected by the Establishment Clause of the First Amendment to the United States Constitution and made actionable by 42 U.S.C. § 1983.

81.     Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

## COUNT II
## Fourteenth Amendment to the United States Constitution

82.     Plaintiffs reincorporate the allegations in paragraphs 1 to 74 as if fully set forth herein.

83.     Some private child placing agencies working under contract with the State treat gay and lesbian couples unequally to heterosexual couples by categorically excluding same-sex couples from applying for and being considered to be foster or adoptive parents.

84.     DHHS, through private child placing agencies that provide adoption and foster care services to children under contract with the State, is turning away same-sex couples seeking to adopt out of the foster care system, such as the Dumonts and the Busk-Suttons, because of their sexual orientation.

85.     DHHS, through agencies with which it contracts, is turning away same-sex couples based on religious objections to placing children with such families.

-20-

86.     There is no legitimate government interest served by denying children access to potentially qualified families based on a religious exclusion.

87.     Defendants, acting under color of state law, have violated and continue to violate the Equal Protection Clause of the United States Constitution by contracting with and funding private agencies that, in providing public adoption and foster care services, discriminate against same-sex couples seeking to become foster or adoptive parents.

88.     Defendants are liable under 42 U.S.C. § 1983 for the violation of Plaintiffs' rights.

89.     Plaintiffs have no adequate remedy at law to redress the wrongs alleged herein, which are of a continuing nature and will cause irreparable harm.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in their favor and:

A.     Declare, pursuant to 28 U.S.C. § 2201, that the State's practice of allowing state-contracted, taxpayer-funded child placing agencies to disqualify prospective families headed by same-sex couples based on agencies' religious beliefs violates the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983;

B.     Enter an order enjoining Defendants, in their official capacities, from contracting with or providing taxpayer funding to private child placing agencies that exclude same-sex couples from consideration as foster or adoptive parents or otherwise employ religious criteria in decisions regarding the screening of prospective foster and

adoptive parents and, other than accommodating a particular child's religious traditions or preferences, the placement of children into foster and adoptive homes;

     C.    Enter an order directing Defendants, in their official capacities, to ensure that lesbian and gay individuals and couples are treated the same as heterosexual individuals and couples by state-contracted child placing agencies;

     D.    Award Plaintiffs the costs and fees and expenses for this action, including, *inter alia*, attorneys' fees and costs incurred in connection with this action, pursuant to 42 U.S.C. § 1988;

     Award such other relief as this Court deems just and proper.

/s/ Jay D. Kaplan

| | |
|---|---|
| Jay D. Kaplan (P38197) | Leslie Cooper |
| Michael J. Steinberg (P43085) | American Civil Liberties Union |
| Kary L. Moss (P49759) |   Foundation |
| American Civil Liberties Union | 125 Broad Street, 18th Floor |
|   Fund of Michigan | New York, NY 10004 |
| 2966 Woodward Avenue | (212) 549-2633 |
| Detroit, MI 48201 | lcooper@aclu.org |
| (313) 578-6823 | |
| jkaplan@aclumich.org | Garrard R. Beeney |
| msteinberg@aclumich.org | Ann-Elizabeth Ostrager |
| | Ryan D. Galisewski |
| Daniel Mach | Jason W. Schnier |
| American Civil Liberties Union | Sullivan & Cromwell LLP |
|   Foundation | 125 Broad Street |
| 915 15th Street NW | New York, NY 10004-2498 |
| Washington, DC 20005 | Telephone: (212) 558-4000 |
| (202) 675-2330 | Facsimile: (212) 558-3588 |
| dmach@aclu.org | beeneyg@sullcrom.com |
| | ostragera@sullcrom.com |
| | galisewskir@sullcrom.com |
| DATED: September 20, 2017 | schnierj@sullcrom.com |

*Attorneys for the Plaintiffs*