```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF MICHIGAN
 2                   SOUTHERN DIVISION

 3  KRISTY DUMONT; DANA DUMONT;
    ERIN BUSK-SUTTON; REBECCA
 4  BUSK-SUTTON; and JENNIFER
    LUDOLPH,
 5
            Plaintiffs,
 6                                    HONORABLE PAUL D. BORMAN

 7   v.                               No. 17-13080

 8  NICK LYON, in his official
    capacity as the Director of the
 9  Michigan Department of Health
    and Human Services; and HERMAN
10  MCCALL, in his official capacity
    as the Executive Director of the
11  Michigan Children's Services Agency,

12          Defendants,

13     and

14  ST. VINCENT CATHOLIC CHARITIES;
    MELISSA BUCK; CHAD BUCK; and
15  SHAMBER FLORE,

16          Proposed Defendant-Intervenors.
    _____/
17

18              MOTION TO INTERVENE

19             Wednesday, March 7, 2018

20                  2:06 p.m.

21

22   (Appearances on the following page)

23
             To Obtain Certified Transcript, Contact:
24       Leann S. Lizza, CSR-3746, RPR, CRR, RMR, CRC
                      (313) 234-2608
25
```

```
 1   APPEARANCES:

 2      For the Plaintiffs:            LESLIE COOPER
                                       ACLU Foundation
 3                                     125 Broad Street
                                       18th Floor
 4                                     New York, New York  10004
                                       (212) 549-2584
 5
                                       JAY KAPLAN
 6                                     American Civil Liberties Union
                                       Fund of Michigan
 7                                     2966 Woodward Avenue
                                       Detroit, Michigan  48201
 8                                     (313) 578-6812

 9                                     ANN-ELIZABETH OSTRAGER
                                       JASON W. SCHNIER
10                                     Sullivan & Cromwell LLP
                                       125 Broad Street
11                                     New York, New York  10004
                                       (212) 558-7357
12

13      For the Defendants            JOHN J. BURSCH
        Lyon and McCall:              Bursch Law PLLC
14                                     9339 Cherry Valley Ave. SE #78
                                       Caledonia, Michigan  49316
15                                     (616) 450-4235

16                                     JOSHUA S. SMITH
                                       Michigan Department of
17                                     Attorney General
                                       Health Education and Family
18                                     Services
                                       P.O. Box 30758
19                                     Lansing, Michigan  48909
                                       (517) 335-1238
20

21      For Intervenor Defendants:    WILLIAM J. PERRONE
                                       Diocese of Lansing
22                                     228 North Walnut Street
                                       Lansing, Michigan  48933
23                                     (517) 342-2522

24
        (Appearances continued)
25
```

```
 1   APPEARANCES (Continued):

 2       For Intervenor Defendants:   STEPHANIE H. BARCLAY
                                      DANIEL ORTNER
 3                                    MARK L. RIENZI
                                      The Becket Fund for Religious
 4                                    Liberty
                                      1200 New Hampshire Ave. NW
 5                                    Suite 700
                                      Washington, D.C.  20036
 6                                    (202) 955-0095

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**TABLE OF CONTENTS**

Motion Hearing                                                    Page

  Argument by Ms. Barclay                                         7

  Argument by Ms. Ostrager                                       28

  Further argument by Ms. Barclay                                32


Exhibits:                                                    Received

  (None offered.)

**MOTION TO INTERVENE**

1                                    March 7, 2018

2                                    Detroit, Michigan

3                          -    -    -

4        (Call to order of the Court, 2:06 p.m.)

5        (Court and Counsel present.)

6            THE LAW CLERK:  The Court calls Case Number 17-13080,

7     *Dumont versus Lyon, et al.*

8            THE COURT:  Okay.  Everyone may be seated except

9     counsel who will be putting their names on the record.  So

10    beginning with the plaintiffs' counsel.

11           MS. OSTRAGER:  Good afternoon, Your Honor.

12    Ann-Elizabeth Ostrager from Sullivan and Cromwell on behalf of

13    the plaintiffs.

14           THE COURT:  Okay.

15           MS. COOPER:  Leslie Cooper from the ACLU on behalf of

16    plaintiffs.

17           THE COURT:  Okay.

18           MR. SCHNIER:  Jason Schnier, Sullivan and Cromwell, on

19    behalf of plaintiffs.

20           MR. KAPLAN:  Jay Kaplan from the ACLU of Michigan on

21    behalf of the plaintiffs.

22           THE COURT:  Which one of you will be arguing?

23           MS. OSTRAGER:  I will, Your Honor.

24           THE COURT:  Okay.  Very good.

25               And for the intervenors?

**MOTION TO INTERVENE**

```
 1          MS. BARCLAY:  Good afternoon, Your Honor.  Stephanie
 2   Barclay on behalf of the proposed intervenors.
 3          THE COURT:  Okay.  And, sir?
 4          MR. RIENZI:  Mark Rienzi for the proposed intervenors,
 5   Your Honor.
 6          THE COURT:  Okay.
 7          MR. ORTNER:  Daniel Ortner for the proposed
 8   intervenors.
 9          THE COURT:  Last name spelled?
10          MR. ORTNER:  O-R-T-N-E-R.
11          THE COURT:  And who will be arguing?
12          MS. BARCLAY:  I will, Your Honor.
13          THE COURT:  And behind you there's a gentleman, for
14   the record.
15          MR. PERRONE:  William Perrone on behalf of the
16   intervenors, Your Honor.
17          THE COURT:  Okay.  Very good.
18          And my understanding is we also have visiting -- not
19   visiting.  They're here as part of the case but not a speaking
20   role, so why don't you identify yourselves beginning with
21   Mr. Bursch.
22          MR. BURSCH:  John Bursch on behalf of defendants.
23          THE COURT:  And spell your name to help Mrs. Lizza,
24   please.
25          MR. BURSCH:  Bursch, B-U-R-S-C-H.
```

ARGUMENT BY MS. BARCLAY

1      THE COURT:  And the other gentleman next to you?

2      MR. SMITH:  Assistant Attorney General Joshua Smith,

3  Your Honor.

4      THE COURT:  Okay.  You all can have a seat.  I'll

5  spread out the pleadings and we'll proceed.

6      The parties are aware that the Court has already

7  permitted St. Vincent to intervene, so this deals with the

8  other intervenors.  One important rule in this courtroom is

9  that the attorneys speaking must speak slowly because

10 Mrs. Lizza, to my right, the court reporter, has the toughest

11 job and she must take down every word.  And don't say "Other

12 people tell me I talk fast" or don't say "I'll try."  Slow

13 down.  You will slow down or you'll sit down.  I see we have a

14 lot of other counsel, if the person arguing on behalf of one

15 individual cannot manage to slow down because it's abusive to

16 the court reporter to speak fast.

17     Okay.  Please proceed.

18     MS. BARCLAY:  May it please the Court.  Your Honor, my

19 name is Stephanie Barclay and I'm here on behalf of the

20 proposed intervenors in this case.

21     THE COURT:  Okay.  You're already speaking too fast.

22 So you must speak slowly at this cadence.  And you will.  Thank

23 you.

24     MS. BARCLAY:  Thank you, Your Honor.

25     We're here this afternoon to discuss proposed

1    intervenors' motion to intervene.  In plaintiffs' complaint at

2    paragraph 1 they ask this court to insure that the State is

3    acting based on the needs of children in Michigan.  They urge

4    this court to prohibit a practice that harms vulnerable

5    children by denying them access to loving families that they

6    desperately need.  In other words, the plaintiffs are asking

7    this court to act based on its assessment of how current or

8    prospective policies would impact foster children and their

9    families.

10           Plaintiffs have placed in issue at the heart of this

11   case, and that's exactly why the prospectives and the

12   individual movants, the foster family and former foster child

13   and St. Vincent Catholic Charities are necessary in this case.

14   This court can't fulfill the plaintiffs' request and actually

15   decide what is in the best interest of foster kids and what

16   will block access to foster families without hearing from the

17   program that will be shut down and the kids and families who

18   would be on the losing end of what the plaintiffs are asking

19   this court to do.  This court needs the full picture before it

20   regarding the impact of its ruling to make the best and most

21   correct decision in this case.

22           Plaintiffs have conceded much of this by conceding

23   that St. Vincent Catholic Charities had been allowed to

24   intervene in this case and this court granted the motion to

25   intervene.

ARGUMENT BY MS. BARCLAY

1    THE COURT:  You're still speaking too fast.  So when

2  people read, they read and speak fast.  You must speak slowly

3  because I will not permit abuse of the court reporter.  So,

4  please, you will speak slowly or we'll go down the line to the

5  next person representing the intervenors.  Okay?  Thank you.

6    MS. BARCLAY:  This court recently granted the motion

7  to intervene in part with regard to St. Vincent, and that makes

8  perfect sense.  If plaintiffs' lawsuit is successful, that

9  means that St. Vincent must close down its public foster and

10  adoption programs.  It means that it can't facilitate support

11  groups that rely on staff for those programs.  It means that it

12  can't help place vulnerable kids with families who have been

13  relying on St. Vincent and working with it for years.  It means

14  it can't allow former foster kids to continue volunteering and

15  mentoring children in its foster program.

16    THE COURT:  Those foster children can work at other

17  programs to do the monitoring; is that correct?

18    MS. BARCLAY:  That's correct.  Your Honor, there's

19  nothing in the record that suggests they couldn't.

20    THE COURT:  Okay.

21    MS. BARCLAY:  But certainly it's understandable that

22  Shamber Flore, a former foster child whose life was changed

23  through this program and who was removed from her own abusive

24  home and given a new life through this program, would have

25  interest in being able to continue volunteering through that

ARGUMENT BY MS. BARCLAY

1    program.

2         Plaintiffs concede and this court correctly concluded

3    that the State does not adequately represent St. Vincent's

4    interest in keeping these programs open.  Again, all of that

5    makes perfect sense.

6         But what doesn't make sense is plaintiffs' argument

7    that the individuals who benefit from these programs, who

8    regularly attend the support group to help their family, who

9    rely heavily on the services from their trusted St. Vincent

10   adoption workers and who volunteer and monitor kids through

11   these programs, that those individuals somehow don't have an

12   interest or a stake in this case.

13        THE COURT:  Let me ask a question.  Can the

14   individuals still go to St. Vincent if St. Vincent were not

15   permitted to exclude individuals from their, I guess ramping up

16   with regard to the request for adoption where they say we're

17   not going to do our groundwork for individuals of same sex?

18   But the programs that you're speaking of that St. Vincent

19   operates can still operate if St. Vincent is no longer

20   permitted to do the groundwork for the State with regard to

21   pre-adoption activity.

22        MS. BARCLAY:  The plaintiffs have themselves

23   recognized at paragraph 45 of their own complaint that there is

24   a risk to faith-based adoption agencies like St. Vincent, that

25   if their ability to operate their foster and adoption programs

1    consistent with their religious beliefs is not protected, then

2    they will be forced to close those programs, and if those

3    programs close, then the Buck family cannot go to the foster

4    program anymore to rely on their trusted adoption workers to

5    adopt future biological siblings of their children in the

6    future.

7          THE COURT:  They can go to other programs, right?  The

8    Bucks would be available -- I mean would have other programs

9    available if the initial parents of the children that they've

10   already adopted decided to have additional children and those

11   children would be put up for adoption or foster care through

12   the State but at other agencies.  Is that correct?

13         MS. BARCLAY:  I don't believe that is correct, Your

14   Honor.  So, but let me start by framing that in context of

15   Rule 24(a), what it requires.  The Bucks simply must

16   demonstrate for this court that their ability to protect their

17   stake in this litigation may be impacted as a practical matter.

18   So what we are asking is for multiple interests, and we'll

19   focus for a moment on future adoption.  May their interest in

20   being able to adopt that child with the trusted St. Vincent

21   workers that they rely on heavily, is it possible that that

22   will be impacted if those staff are all laid off and that

23   program is closed?  The answer is absolutely yes for a number

24   of reasons.  Number one, the -- an agency, when they receive a

25   referral for a child, only has one hour to decide where to

| 1 | place that child.  That comes from the State's own contractual |
|---|---|
| 2 | requirements for the agency.  Is it possible that the chances |
| 3 | of the Buck family receiving the phone call in one hour will be |
| 4 | diminished if the agency who knows about that family and who |
| 5 | has them on a list and who has record and deep institutional |
| 6 | knowledge about those children and siblings, if that agency is |
| 7 | not running that program anymore, is it possible that they |
| 8 | won't get that phone call?  I would submit it's not only |
| 9 | possible but it is almost certain that the Bucks would not |
| 10 | receive that phone call. |
| 11 | THE COURT:  Why?  Why would they not get a phone call |
| 12 | if they were at another agency because St. Vincent's would no |
| 13 | longer be in operation with regard to doing the groundwork and |
| 14 | then went to another agency which said, yes, we'll accept and |
| 15 | we'll recommend that you receive a child and that you are |
| 16 | appropriate to care for the child? |
| 17 | MS. BARCLAY:  Just a moment, Your Honor. |
| 18 | THE COURT:  Sure.  There's no rush. |
| 19 | MS. BARCLAY:  So, again, considering the question, is |
| 20 | there a possible diminishment on the likelihood that the Bucks |
| 21 | would receive that phone call, the answer, I think, is |
| 22 | absolutely yes, that there's a possibility that that impact |
| 23 | would change.  It is at docket 16, Exhibit 2, ECF page 5 where |
| 24 | the foster contract talks about the fact that if the State |
| 25 | makes a referral for a child placing agency, then they must |

ARGUMENT BY MS. BARCLAY

1   accept or decline that referral immediately within one hour.

2   Under state policies the relative checklist agencies use when

3   considering placement or when looking at where to place a child

4   come from the agency's own, quote, prior case records.  And the

5   Bucks would not be on the prior case records of a different

6   agency.  There's another --

7       THE COURT:  You don't think that agency could get the

8   records from St. Vincent's?  If St. Vincent's were no longer a

9   proper agency because they will not allow the same-sex couples

10  to take advantage of their ability to process the request,

11  they're not going to destroy all their records they have.  I'm

12  sure they would make them available to another agency.  If the

13  Bucks were going to seek adoption of another biological child

14  from the same family that produced the other children that the

15  Bucks adopted, they would be able to get the St. Vincent files,

16  I'm sure.  They're not going to destroy that if they are no

17  longer permitted to do the groundwork, are they?

18      MS. BARCLAY:  There's no mechanism that I'm aware of,

19  Your Honor, for those case files to be given to every other

20  agency in the state.  There's no mechanism plaintiffs have

21  pointed to or alleged.  And if we're also thinking about in one

22  hour would an overworked foster care worker know where to go to

23  be able to look through voluminous case files and know what to

24  do as compared to a St. Vincent worker who knows the Bucks, who

25  knows their story, who knows their family, who has their number

1  saved in their telephone call.  Under Rule 24, all we're asking

2  is may that have an impact, and I think it's much more possible

3  than just may.  There's a very high likelihood that it would

4  have an impact.

5      THE COURT:  The one-hour rule that you're speaking of

6  is not cast in stone, and I'm sure that if they applied to a

7  court to extend it beyond one hour that it would not take long

8  for a court to say that that's unreasonable to just give an

9  hour to get a decision on whether or not to do an adoption.

10  That seems like a pretty harsh time limit on a decision that

11  affects the lives of children and families.  So beyond the

12  one-hour issue, the other reasons why you seek the intervention

13  of the families.  Please proceed.

14      MS. BARCLAY:  Thank you, Your Honor.

15      Beyond whether or not they would get that phone call

16  within one hour, as you say, there's also the stake the Bucks

17  have in this litigation in being able to adopt with the support

18  of the adoption workers who have institutional knowledge about

19  their family, who with previous adoptions developed a

20  reputation of trust because they were available to be called

21  24/7, because they went with the Bucks to every single doctor

22  appointment, because they acted as successful intermediaries

23  with sometimes very hostile birth parents.  Do the Bucks have a

24  stake in being able to work with that adoption worker if they

25  want to adopt in the future?  The answer is they absolutely do

ARGUMENT BY MS. BARCLAY

1   and that is something --

2         THE COURT:  Are you saying that other adoption workers

3   wouldn't have the same interest so the child -- as part of

4   their obligation in receiving the state contract and also in

5   following up on the program, they wouldn't have the same

6   concerns, the same abilities, the same feelings that the

7   St. Vincent would?  Are you saying it's either St. Vincent or

8   that people will not get help and care from other agencies?

9         MS. BARCLAY:  Respectfully, Your Honor, under

10  Rule 24(a), all I'm saying is that the Bucks do have a stake in

11  being able to keep working with that -- those adoption workers

12  that they do have that relationship with.  They have a stake

13  and an interest in being able to continue relying on someone

14  that they have developed a relationship of trust with.  That's

15  not to suggest that there aren't other good adoption workers

16  out there.  There certainly are, but there's nothing

17  unreasonable about the Bucks wanting to continue to work with

18  the adoption workers that they trust and rely on and who have

19  been critical for the Bucks being able to complete this

20  difficult process.

21         They also have a stake in being able to continue to

22  receive the support services from the support group that

23  St. Vincent facilitates and that the Bucks regularly attend

24  right now.

25         THE COURT:  Let me ask this question.  If the children

ARGUMENT BY MS. BARCLAY

1    were adopted through another agency, could they not go, the

2    parents, the adoptive parents, go to St. Vincent's to get

3    support services that they had previously gotten?

4           MS. BARCLAY:  My understanding, Your Honor, is that

5    St. Vincent facilitates support services and there are support

6    groups with staff right now that are also staff that

7    participate in the foster and adoption programs.  And in the

8    Snoeyink declaration --

9           THE COURT:  Spell that to help Mrs. Lizza.  I have it

10   right here.  Let me just help Mrs. Lizza by spelling that name.

11   It is S-N-O-E-Y-I-N-K.  First name Gina, G-I-N-A.  Okay.  Thank

12   you.

13          MS. BARCLAY:  Thank you, Your Honor.  That spelling

14   was going to be tricky for me, so I appreciate it.

15          THE COURT:  Right.

16          MS. BARCLAY:  St. Vincent would have to immediately

17   lay off staff associated with those programs if they were

18   prohibited from continuing to partner with the State.  So is

19   there some possibility under Rule 24(a) that if those staff are

20   laid off, that that's going to impact their ability to continue

21   facilitating support groups?  The answer is certainly yes.

22          THE COURT:  The adequacy of representation by

23   St. Vincent, is that not sufficient in this case to represent

24   the interest of the Bucks and the other individual in this

25   case?

1      MS. BARCLAY: First, Your Honor, there is no case that

2  plaintiffs have pointed to that lets the plaintiffs carve up a

3  joint motion filed by parties who at the time they all filed a

4  joint motion they were all inadequately represented by existing

5  parties. That is, as far as I'm aware --

6      THE COURT: Which parties were inadequately

7  represented by existing par -- in other words, you're saying

8  that the Bucks were inadequately represented previously? Is

9  that what you're saying?

10     MS. BARCLAY: Correct. I am saying that at the time

11 the motion to intervene was filed --

12     THE COURT: Right.

13     MS. BARCLAY: -- and that the only existing parties

14 were the plaintiffs and the State, and plaintiffs have conceded

15 that the State did not adequately represent the interest of

16 keeping St. Vincent programs open. Likewise, the State did not

17 adequately represent the interest of the Bucks or Shamber

18 Flore. And so I'm not aware of any case that lets plaintiffs

19 carve up a joint motion. They were all inadequately

20 represented by existing parties. Plaintiffs are asking this

21 court to break new ground without pointing to any authority.

22 And plaintiffs shouldn't be able to handpick the litigating

23 opponent simply based on which intervenor they choose to

24 sequentially concede to. It doesn't make sense to read Rule 24

25 that way. That's not how the Sixth Circuit has read Rule 24.

ARGUMENT BY MS. BARCLAY

1          Under *Grutter*, the Sixth Circuit allowed 41 students

2     and three pro affirmative action coalitions to intervene.   In

3     *Linton*, they allowed six nursing homes to intervene.   In

4     *Jansen,* they allowed an entire class of black applicants.

5     Other circuits do the same.   And the rule the plaintiffs are

6     proposing in *Grutter* --

7          THE COURT:   *Grutter*, you're talking about

8     G-R-U-T-T-E-R?

9          MS. BARCLAY:   Correct.

10         THE COURT:   I just want to help Mrs. Lizza.   Thank

11    you.

12         MS. BARCLAY:   Under the rule that plaintiffs are

13    proposing in *Grutter*, the plaintiffs could have conceded to

14    allow one student in, their litigating opponent of choice, and

15    then turn the other 40 students away.   But even if it is the

16    case that the individual movants in this case have to

17    demonstrate that St. Vincent does not adequately represent

18    their interest, they're able to do so as well based on the

19    distinct institutional constraints that St. Vincent faces that

20    individual movants do not and based on the uniqueness and the

21    very personal nature of the harm that individual movants face

22    that is different.   In *Grutter* --

23         THE COURT:   Isn't that really encompassed in

24    St. Vincent's motion to intervene?   Most of the motion to

25    intervene, the initial one before the court granted it, spoke

1  about the need for St. Vincent's which the plaintiffs are not

2  contesting and then how that is being carried through on behalf

3  of the individuals and Miss Flore through the operation of

4  St. Vincent's.  So isn't this a situation sort of like

5  Judge Lawson found in *Coalition to Defend Affirmative Action*

6  *versus Granholm*, 240 F.R.D. 368 Eastern District of Michigan,

7  2006.  It says since the Attorney General was allowed to

8  intervene and the interests are really aligned with those other

9  parties, there's little likelihood that their participation

10  would shed any new light on the issues presented.  And that how

11  would St. Vincent be inadequate to advance the interest of the

12  Bucks and the other individual, Miss Flore?

13      MS. BARCLAY:  I have four answers for that question,

14  Your Honor.

15      THE COURT:  Good.

16      MS. BARCLAY:  Number one, in the *Coalition* case, the

17  Attorney General was already admitted and was, therefore,

18  already an existing party when the court analyzed whether that

19  existing party could adequately represent the interest of the

20  additional movants.

21      THE COURT:  When you say it was already in, in

22  Judge Lawson's opinion it said the Michigan Attorney General

23  was allowed to intervene in that case at page 376.  But be that

24  as it may, the Attorney General in that case was allowed to

25  intervene.  In this case, St. Vincent is allowed to intervene.

ARGUMENT BY MS. BARCLAY

1   And the bottom line is can they not and do they not represent

2   the interests of the Bucks and Miss Flore.

3          MS. BARCLAY:  I will address that question, Your

4   Honor, but I do think it's important, as far as whether or not

5   *Coalition to Defend Affirmative Action* supports what they're

6   suggesting here.  The Attorney General was allowed to

7   intervene, but on the same day that the Court granted the

8   motion to intervene additional private parties sought to

9   intervene.  So that's -- was the chronology in that case and

10  there was also a timeliness issue for those additional parties.

11  There was a posture here where there's a joint motion to

12  intervene and at the time all intervenors --

13         THE COURT:  Timeliness is not an issue.  That's clear.

14         MS. BARCLAY:  Right, agreed.

15         THE COURT:  Slow down.  Thank you.

16         MS. BARCLAY:  So that case, again, doesn't support the

17  notion that plaintiffs should be allowed to carve up a joint

18  motion to intervene, but beyond that, Your Honor --

19         THE COURT:  But when you say carve up a joint motion,

20  because the joint motion is three different parties.  I think

21  the Court has a duty to examine each party that seeks to

22  intervene to see whether it's proper to intervene under 24(a)

23  or 24(b) which is permissive intervention.  I think that's the

24  Court's job, to see whether to have three parties or two

25  parties or one party represent a particular position.  So

ARGUMENT BY MS. BARCLAY

1   that's why I'm asking these questions and why it's permissible

2   to examine each one of the three.

3        MS. BARCLAY:  As to your question about can't some of

4   the evidence come in or can't the arguments come in about the

5   individual events if St. Vincent intervenes, it is certainly

6   true, Your Honor, that St. Vincent and the individual movants

7   have interests that are related.  I'm not going to stand here

8   and tell you that they're unrelated.  They're similar.  They're

9   distinct and they're different.  But really only two scenarios

10  can arise, Your Honor.  Number one, it's possible that --

11       THE COURT:  Let me ask, do you need some water.  We

12  can get you some water if you need -- oh, okay.  Good.  Take a

13  minute.  Take a sip.  Because you're starting to get hoarse.

14       MS. BARCLAY:  Thank you, Your Honor.

15       THE COURT:  Okay.

16       MS. BARCLAY:  So there are two scenarios that I can

17  foresee arising in this case, Your Honor.  Number one, perhaps

18  it will be the case that the evidence and the arguments made by

19  St. Vincent will be exactly the same whether or not individual

20  movants come in or not in which case there is absolutely going

21  to be no prejudice and no delay by allowing individual movants

22  into this case and under both *Liberty Capital Group* and *Miller*

23  it would be an abuse of discretion not to allow them to

24  permissively intervene.  On the other hand --

25       THE COURT:  You're saying to have separate arguments

ARGUMENT BY MS. BARCLAY

1   as to each one even though one argument will -- the same

2   argument will apply to all three?

3            MS. BARCLAY:  In *Liberty Capital Group* and in *Miller*

4   the court said that if there's no prejudice or delay --

5            THE COURT:  Is that not prejudice in terms of judicial

6   resources and hearing the same argument from three different

7   people when it's still the same issue?  As to whether they

8   provide or permit intervention.

9            MS. BARCLAY:  That's a letter matter, that's not how

10  the Sixth Circuit interpreted the permissive rules of

11  intervention in *Liberty Capital Group* or in *Miller*, and as a

12  practical matter, I promise that I won't just say the same

13  argument three times so you have to sit through it.

14           THE COURT:  Thank you.

15           MS. BARCLAY:  So that was the first scenario that

16  might arise.

17           The second scenario that might arise, and I'd like to

18  discuss this a little bit more, is that there may be different

19  evidence that -- and different arguments that can be made if

20  an -- individual movants are parties to the case.  And I'll

21  discuss a little bit more in a moment why that might happen.

22  But if that is the other scenario, then that simply confirms

23  that individual movants have a right under Rule 24(a) to be

24  here to insure that that distinct perspective is heard by this

25  court.

ARGUMENT BY MS. BARCLAY

```
 1            So why might the arguments be different?  Why might
 2    the evidence be different?  Under Grutter, the Sixth Circuit
 3    recognized that the university might face different, quote,
 4    internal and external institutional pressures as to arguments
 5    they could make or evidence they could put on.  That's
 6    certainly possibly true of St. Vincent in this case.
 7    St. Vincent might face, for example, different constraints or
 8    pressures about the types of arguments or evidence they could
 9    make regarding the inadequacy of services provided by state
10    adoption agencies and why their services are critical.  And
11    individual movants are not limited in the same way.  Individual
12    movants also face a very personal harm, a unique harm, a
13    permanent impact on their families in terms of loss of services
14    that they rely on right now and other potential impacts we've
15    discussed about adoption in the future.  And Grutter talked
16    about the fact that students as individuals faced a unique harm
17    that the university as an institution did not and that was
18    relevant.
19            The Sixth Circuit has also recognized that factual
20    expertise of parties may be relevant to inadequacy of
21    representation and for the need for those parties to be before
22    the court.  One case that is relevant to this question, Your
23    Honor, is American Beverage Association v. Snyder, and that's
24    2011 Westlaw 13128662.  In that case the Court allowed a party
25    to intervene because it, quote, brought a unique perspective to
```

1   this litigation and can provide factual evidence relating to

2   practical workings of the policy at issue and the extent and

3   effect of the impact of the litigation on those parties.

4         THE COURT:  But isn't that what your brief on behalf

5   of both St. Vincent and on behalf of the parties, it all flows

6   through St. Vincent and the services that they offer, provide

7   to the Bucks and the opportunity they provide to Miss Flore.

8   So it all flows through the need for St. Vincent to be able to

9   continue to operate.

10        MS. BARCLAY:  Well, to be clear, Your Honor, I believe

11  that this evidence is -- should be admissible either way,

12  whether the individual movants are party to the case or not.

13        THE COURT:  Not arguing that.  Not arguing against it.

14        MS. BARCLAY:  The plaintiffs are, Your Honor, and

15  maybe today they will stand up and admit that this evidence

16  should come in either way, but in their briefs right now they

17  dispute the relevance of that evidence coming in.  And their

18  ability to make arguments about the relevance of this evidence

19  might change depending on whether individual movants are

20  actually a party to this case or not.

21        The Sixth Circuit has recognized, also, the important

22  difference between merely offering evidence and a proceeding or

23  being an actual party to the case that has the ability to

24  control and initiate legal proceedings and have rights with

25  respect to appellate rights.  That's why in U.S. -- *U.S. v.*

ARGUMENT BY MS. BARCLAY

1   *State of Michigan* and in *Miller* the Court emphasized the

2   importance of that, and in *Miller* the Sixth Circuit overturned

3   this court's decision to deny intervention to the chamber of

4   commerce even though it was allowed to still introduce the

5   evidence that it wanted to in that case.  So the question that

6   I think would be relevant for the plaintiffs here is should

7   this evidence come in either event, since this lawsuit

8   ultimately is about harm to children and access to families.

9   And if it should come in, then what prejudice or delay can

10  possibly result from allowing individual movants to have full

11  status as parties to this case.

12          Your Honor has also asked about can't some of the

13  individual movants go to --

14          THE COURT:  Can't some of what?

15          MS. BARCLAY:  My understanding is this court

16  earlier --

17          THE COURT:  You're speaking so fast.  Can't the Court

18  allow in?  Go ahead.  Finish your sentence.  I didn't hear it.

19          MS. BARCLAY:  Let me rephrase it, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MS. BARCLAY:  For a question that was being addressed

22  earlier as far as could the individual movants go to other

23  agencies, that question is also, again, relevant to plaintiffs

24  in this case.  Plaintiffs certainly can go to other agencies if

25  their interest is just to adopt or foster any child.  To the

ARGUMENT BY MS. BARCLAY

1  extent their interest is only to adopt with St. Vincent, then
2  there's a redressability issue because the relief that
3  plaintiffs seek will result in St. Vincent's programs being
4  closed which means that not only will they not be able to use
5  these programs, no one will.  But that same redressability
6  issue does not face the Bucks or Shamber Flore who are asking
7  to be able to continue to rely on support and to be able to
8  have the possibility open to them in the future of adoption
9  that they have right now.  And to be able to continue bond
10  hearing through this program just as Shamber Flore can right
11  now.  And the relief that they're asking for this court is
12  certainly redressable if this court rules in its favor.

13      THE COURT:  Let's talk about permissible intervention
14  because you've been concentrating on 24(a).  Let's talk to
15  24(b), please.

16      MS. BARCLAY:  Under permissible intervention, the
17  Court may permit intervention if the party has a claim or
18  defense that shares with the main action a common question of
19  law or fact, and the Sixth Circuit and other circuits have
20  interpreted, if there is no prejudice or delay from allowing
21  that intervention.

22      In this case, Your Honor, the plaintiffs have based
23  their establishment clause claim on the harm to children and
24  the impact on families and the importance of analyzing that.
25  In paragraph 11 of their complaint, for example, they explained

1    that the establishment clause is violated because the State's

2    policy, quote, fails to take adequate account of the burdens

3    imposed on children, specifically the children with whom the

4    State hires these agencies to serve, end quote.

5         For their equal protection clause claim, in paragraph

6    86 they say --

7         THE COURT:  And 12 also they speak about equal

8    protection, but I'll turn up to -- 86 you said?

9         MS. BARCLAY:  Correct.

10        THE COURT:  Okay.

11        MS. BARCLAY:  In paragraph 86 they say, quote, there's

12   no legitimate government interest served by denying children

13   access to potentially qualified families based on a religious

14   exclusion, end quote.

15        There are other similar quotes I can point to, but the

16   bottom line is that the common question of law and fact that

17   the proposed intervenors share in this case is what is going to

18   be the impact and the burden on children and the State's

19   legitimate interest in serving families and children.  The

20   evidence that they offer factually as far as how they are

21   impacted as -- matters also to this question of law as far as

22   does the State have a legitimate interest and is -- are there

23   third-party harms that are unjustified under the establishment

24   clause.  And, again, the plaintiffs haven't made any sort of

25   credible allegation of why there would be prejudice or delay by

1    allowing the individual movants to participate in this case.

2            THE COURT:  Okay.  Thank you.  You're the moving

3    party, so I will call you back --

4            MS. BARCLAY:  Thank you, Your Honor.

5            THE COURT:  -- after plaintiffs argue.

6            Let me ask a couple questions before you begin that

7    were raised by counsel for the intervenors.  Will the

8    plaintiffs object to evidence with regard to the impact at the

9    ultimate hearing, the impact on the Bucks and Miss Flore?

10            MS. OSTRAGER:  No, Your Honor.  The plaintiffs do not

11    object to any evidence that the Court deems relevant to the

12    disposition of the State and St. Vincent's motion to dismiss

13    as --

14            THE COURT:  Their slippery slope argument goes if the

15    evidence comes in, then why not let the parties intervene.

16            MS. OSTRAGER:  Your Honor, the proposed individual

17    movants through that argument are skipping over all of the

18    requirements of Rule 24 to reach an argument about prejudice

19    and delay.  First, they have to show, as to intervention by

20    right, that the existing parties which now include

21    St. Vincent's would not be an adequate representative and they

22    can't show that because the law is clear that there's a

23    presumption that they are an adequate representative if they

24    share the same ultimate objective, which they clearly do, and

25    they haven't articulated a separate objective from either the

ARGUMENT BY MS. OSTRAGER

1    State or St. Vincent's.

2        In addition, they have to show for permissive

3    intervention a claim or defense in common with the original

4    action which they haven't articulated because all of their

5    interests flow from a desire to continue to work with

6    St. Vincent's and don't go to the constitutionality of the

7    State's practice of contracting practices.

8        So there's a lot of steps that they've skipped to get

9    to prejudice and delay, but even moving to that step, we don't

10   know -- this litigation could be taken in any number of

11   anticipated directions by the addition of three additional

12   parties.  It would require additional court and litigation --

13   litigator and party resources to deal with their potential --

14   another motion to dismiss, additional arguments.  And there's

15   no basis under Rule 24 for these additional proposed movants to

16   come in.

17        THE COURT:  You do admit though that under *Miller*

18   *versus AFL-CIO* the Sixth Circuit said, you know, almost when in

19   doubt, I mean, they didn't go that far, but they said it's --

20   there is almost like a presumption in favor of intervention

21   unless you can really show strongly that they should not be

22   allowed to intervene.  In that case, didn't the state chamber

23   of commerce really have the same position but they were a

24   different entity, as did the defendant?

25        MS. OSTRAGER:  I agree with Your Honor that there is

1    case law that suggests a capacious reading of Rule 24, but I

2    think that the presumption is the opposite, that the existing

3    parties represent the interest of proposed movants.  And in

4    addition, I don't think that the rule has no content.  I think

5    that the proposed individual movants here are no different from

6    any of the thousands of people who receive services or benefits

7    or interact with the hundreds of agencies under contract with

8    the State and they haven't identified a cognizable legal stake

9    in this litigation.

10            THE COURT:  Okay.  Understand.

11            MS. OSTRAGER:  I think as to some of the other points

12   that were raised by the individual movants, the Court is

13   absolutely correct that it has a duty to examine each party,

14   and the cases in which there are classes of similarly situated

15   proposed intervenors are distinguishable meaning if there are a

16   number of nursing homes, as in *Linton*, that is distinguishable

17   from the circumstances here where individual movants are not in

18   the same position as St. Vincent's which is a party to

19   contracts with the State when this case concerns the question

20   of whether the State of Michigan is violating the Constitution

21   when it contracts out public child welfare functions to private

22   agencies and then allows those agencies on the basis of

23   religious objection to turn away qualified same-sex parent

24   families who seek to adopt or foster children who are in the

25   State's care.

ARGUMENT BY MS. OSTRAGER

1    THE COURT:  Does it make a difference, the fact that

2  they can go, the plaintiffs can go to many other agencies to

3  get the same work done, that the State -- many of the agencies

4  that the State contracts with to do the groundwork for adoption

5  and, indeed, after the groundwork results in success and

6  they're allowed to adopt, they can -- St. Vincent says they can

7  come and receive children that are within the St. Vincent

8  facilities to adopt.  It's just the groundwork that ultimately

9  results in the permission that is denied based on the religious

10  tenets of St. Vincent's.

11    MS. OSTRAGER:  It does not -- well, certainly it

12  doesn't matter to the intervention motion, but with respect to

13  the merits of the case and the motion to dismiss, it does

14  not -- that is not an accurate characterization of the injury

15  that's been alleged in the complaint here.  The complaint

16  alleges that standing in the shoes of the State and performing

17  a public function, the State -- these agencies cannot do what

18  the State itself can't do which is turn away families for

19  reasons disconnected from the needs of children and in

20  violation of the Constitution.

21    As to the intervention motion, plaintiffs's ability to

22  go elsewhere is not at issue, but should we get there after the

23  State's motion or St. Vincent's motion to dismiss, I think

24  plaintiffs would put on evidence to show that at the time they

25  sought out these agencies, they were the only viable options

FURTHER ARGUMENT BY MS. BARCLAY

1   within any reasonable --

2           THE COURT:  Well, we're not dealing with that today.

3           MS. OSTRAGER:  Correct, Your Honor.

4           THE COURT:  That's correct.  Okay.  So your argument

5   is that the intervenors, apart from St. Vincent's, all their

6   claims flow through St. Vincent's and really their claims are

7   derivative of if St. Vincent keeps its contract with the State

8   or loses its contract with the State and that those services

9   are available without regard to St. Vincent as being exclusive

10  provider of those services?

11          MS. OSTRAGER:  Yep.  That's all correct, Your Honor.

12          THE COURT:  Okay.  Thank you.

13          MS. OSTRAGER:  Okay.

14          THE COURT:  He's bringing the water, so --

15          MR. RIENZI:  Just in case.

16          MS. BARCLAY:  Sure.

17          THE COURT:  Thank you.

18          MS. BARCLAY:  Thank you, Your Honor.

19          Your Honor, a moment ago you asked isn't there

20  essentially a rule that when in doubt, we allow intervention,

21  and you said maybe in *Miller* the Court didn't go quite that

22  far.  But in *Grutter*, the Sixth Circuit did go exactly that

23  far.  The Sixth Circuit said, quote, Even if it could be said

24  that the question raised is a close one, close cases should be

25  resolved in favor of recognizing an interest under Rule 24(a).

33

1   And there was also a citation there to *Miller*.  That's on

2   page 399.

3            So this is a case where if it's even a close question

4   at all, individual movants should be allowed in.

5            Plaintiffs were arguing that this court should, if

6   there's a joint motion for intervention, analyze individually

7   and carve up and in some ways pit against each other whether

8   each party can come in.  And I just want to, again, flag for

9   the Court that that's not what the Sixth Circuit did in

10  *Grutter*.  The Sixth Circuit didn't say can't one student

11  represent the interests of the other 40 and then turn them

12  away.

13           And in *Grutter*, those students weren't party to any

14  contract.  The plaintiffs raise that argument again about the

15  importance of being a party to a contract.  But the Sixth

16  Circuit and the Supreme Court have, quote, rejected the notion

17  that Rule 24(a) requires a specific legal or equitable

18  interest, end quote.

19           There are a number of cases with --

20           THE COURT:  Yeah, are there any restrictions on

21  intervention?  Are you saying that the Supreme Court and the

22  Sixth Circuit say that any time someone wants to intervene that

23  they must be allowed to intervene?

24           MS. BARCLAY:  This -- the Sixth Circuit has recognized

25  some intervention limitations in *Blount* and in *Tennessee* and in

1    those cases where the interest was primarily and almost purely

2    economic.

3           THE COURT:  That's B-L-O-U-N-T, right?  Just to make

4    sure we have the correct spelling.

5           MS. BARCLAY:  I believe so, B-L-O-U-N-T.

6           THE COURT:  Thank you.

7           MS. BARCLAY:  In those cases where an interest was

8    simply primarily economic and where those interests could be

9    satisfied through other mechanisms, so it was a fungible

10   interest, then intervention was not warranted in those cases.

11   Here individual movants have an interest that is absolutely not

12   just economic and that they allege cannot be satisfied in the

13   same way through other adoption agencies.

14          One thing that's important to keep in mind, Your

15   Honor, as well because we've had some back and forth about

16   maybe how some of these facts would play out or couldn't they

17   rely on another agency, the Sixth Circuit has said, quote, In

18   determining --

19          THE COURT:  When you say, quote, tell me which case

20   you're speaking about.

21          MS. BARCLAY:  This is *Horrigan v. Thompson*.

22          THE COURT:  Spell *Horrigan*.

23          MS. BARCLAY:  H-O-R-R-I-G-A-N.

24          THE COURT:  Okay.  Cite?

25          MS. BARCLAY:  145 F.3d 1331, it's a Sixth Circuit

**FURTHER ARGUMENT BY MS. BARCLAY**

1    case.

2              THE COURT:  Thank you.

3              MS. BARCLAY:  The Sixth Circuit said in that case,

4    quote, In determining whether intervention should be allowed,

5    we must accept as true the nonconclusory allegations in the

6    motion, end quote.  If it would be helpful, I could point Your

7    Honor to some other cases that say a similar thing.

8              THE COURT:  That's okay.  I'm aware.

9              MS. BARCLAY:  So accepting as true the allegations in

10   the declarations by the proposed intervenors, they cannot

11   elsewhere satisfy their interest in receiving the support

12   services that, for example, the Bucks rely on right now.  There

13   is a significant chance that if these programs were shut down,

14   they would not be able to adopt in the future this -- another

15   biological sibling.  Certainly they wouldn't be able to adopt

16   with the same trusted workers that they have relied on.

17             THE COURT:  Well, but if those workers retire, they're

18   not going to have the same workers.  There are other workers

19   that care about and love children at other agencies as well.

20   So are you creating a scenario where only St. Vincent and only

21   those people that helped the Bucks adopt their other children

22   can facilitate adoption of the next child if the biological

23   parents proceed to have another child?  Is that what you're

24   saying?

25             MS. BARCLAY:  I'm not creating that scenario nor does

FURTHER ARGUMENT BY MS. BARCLAY

1    Rule 24 require that scenario for the Bucks to be able to claim

2    that they have a stake in this litigation, a stake in being

3    able to continue to rely on the workers and the program that

4    has the institutional knowledge of their family.  And, again,

5    all of that is separate from the support services they rely on

6    right now.

7            As for some other issues this court addressed with the

8    plaintiffs, the plaintiffs stated that they don't object to

9    evidence coming in from the individual movants if this court

10   finds it relevant.  But if you will permit me just a moment,

11   I'd like to quote this spot in their brief where they say --

12           THE COURT:  Sure.

13           MS. BARCLAY:  -- where they say that this evidence is

14   not relevant.

15           THE COURT:  Yeah, we're in no rush.

16           MS. BARCLAY:  On page 4, Your Honor, of docket

17   number 21.

18           THE COURT:  Let me get there.

19           MS. BARCLAY:  This is plaintiffs' response in partial

20   opposition to motion to intervene.

21           THE COURT:  Okay.  Plaintiffs' response, page 4.

22           THE LAW CLERK:  Page ID.

23           MS. BARCLAY:  Page is four.

24           THE LAW CLERK:  Page ID.

25           MS. BARCLAY:  The ECF page, Your Honor --

```
 1              THE COURT:  I don't need the ECF.  I have page 4 which
 2    is 10 of 23 on ECF.
 3              MS. BARCLAY:  That's correct, Your Honor.
 4              THE COURT:  Please go ahead.
 5              MS. BARCLAY:  At the top of that paragraph they say,
 6    "Individual movants say" --
 7              THE COURT:  See, when you read, you read fast.  We're
 8    in no rush.  Mrs. Lizza needs it slow.  "Individual movants,"
 9    go ahead.
10              MS. BARCLAY:  Quote, The individual movants say they
11    wished to offer factual testimony about the benefits they
12    receive from St. Vincent.  That testimony is not legally
13    relevant to plaintiffs' claims, end quote.
14              THE COURT:  And they say, and to finish the sentence,
15    "and in any event, is capable of introduction by other parties
16    if the court deems that such evidence should be admitted."
17              MS. BARCLAY:  Right.  But the important point is they
18    are contesting the relevance of this evidence, and is it
19    possible under the rules of intervention that their ability to
20    make arguments about the relevance of this evidence changes or
21    are impacted whether or not the individual movant's a party to
22    the case?  That's certainly possible unless plaintiffs stand
23    back up and concede before this court today that that evidence
24    is relevant.  And, again, under *Miller* and under *Liberty*
25    *Financial Group*, if the evidence can come in and if the
```

1    evidence does come in, then they cannot point to any prejudice

2    or delay from having the individual movants be a party to the

3    case in any event.

4         Plaintiff said that the individual movants are

5    skipping a step when it comes to permissive intervention

6    because we didn't discuss the common claim -- if a claim or

7    defense it shares with the main action a common question of law

8    or fact.  Number one, I did address the way in which there is

9    that common element based on harm to children and families.

10   Number two, plaintiffs' entire argument about why individual

11   movants should not be allowed under intervention as a right

12   under 24(a) is because the legal claims and arguments are

13   exactly the same and can come in under St. Vincent.  And if

14   that's the case, then that's absolutely an example of how this

15   is the same common claim or defense.  Plaintiffs can't have it

16   both ways and then allege under permissive intervention that it

17   is completely separate.

18        THE COURT:  Just a question.  With regard to *Horrigan,*

19   you're saying any allegations of intervention of somebody

20   seeking intervention is sufficient to allow someone to

21   intervene?  Just a little elaboration on *Horrigan.*

22        MS. BARCLAY:  Yes, Your Honor.  Just a moment.

23        THE COURT:  Sure.

24        MS. BARCLAY:  So *Horrigan* is saying, Your Honor, that

25   if you're determining whether intervention should be allowed,

1    then you do have to accept as true nonconclusory allegations of

2    the motion.  The allegations that individual movants are making

3    here about the stake that they have in the continued operation

4    of these programs is much more than conclusory.  Under Rule 24,

5    and as the Court analyzed in *Miller*, that goes to the text of

6    the intervention rules which says that movants need not

7    definitively prove that an unfavorable disposition of their

8    case would necessarily impair their right only that it may

9    impair or impede their ability to protect their interest.

10              If this case enters evidentiary proceedings,

11   plaintiffs may offer evidence at that point disputing the harm

12   that individual movants allege will impact them, and that's a

13   fact question that will be relevant once they're parties to the

14   case but it's not a legal basis that the Sixth Circuit allows

15   to exclude the individual movants right now at the outset of

16   the case when they may be impacted by the outcome of this

17   litigation.

18              THE COURT:  Okay.

19              MS. BARCLAY:  The plaintiffs also said that

20   intervention is not warranted if the individual movants share

21   the same objective as St. Vincent.  But the Sixth Circuit

22   rejected the idea that there must be different objectives to

23   justify intervention in *Grutter* where the students shared the

24   objective with the university.

25              THE COURT:  And in *Miller*.

FURTHER ARGUMENT BY MS. BARCLAY                    40

```
 1          MS. BARCLAY:  In Miller, in Liberty Capital Group and

 2   in the Eastern District of Michigan in the American Beverage

 3   Association.  There's no legal authority for that claim.

 4          Unless Your Honor has any further questions.

 5          THE COURT:  I want to thank counsel --

 6          MS. BARCLAY:  Thank you.

 7          THE COURT:  -- on both sides for excellent argument.

 8   The Court will take it under advisement, render an opinion.

 9   Thank you.

10          MS. BARCLAY:  Thank you.

11       (Proceedings concluded, 3:04 p.m.)

12                        -   -   -

13                  CERTIFICATION OF REPORTER

14

15     I, Leann S. Lizza, do hereby certify that the above-entitled

16   matter was taken before me at the time and place hereinbefore

17   set forth; that the proceedings were duly recorded by me

18   stenographically and reduced to computer transcription; that

19   this is a true, full and correct transcript of my stenographic

20   notes so taken; and that I am not related to, nor of counsel to

21   either party, nor interested in the event of this cause.

22

23

24   S/Leann S. Lizza                          3-15-2018

25   Leann S. Lizza, CSR-3746, RPR, CRR, RMR        Date
```