UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTY DUMONT; DANA DUMONT;
ERIN BUSK-SUTTON; REBECCA        Case No. 17-cv-13080
BUSK-SUTTON; and JENNIFER
LUDOLPH,                         Paul D. Borman
                                 United States District Judge

                 Plaintiffs,

v.

NICK LYON, in his official capacity
as the Director of the Michigan department
of Health and Human Services; and
HERMAN MCCALL, in his official
capacity as the Executive Director of
the Michigan Children's Services Agency,

                 Defendants,
and

ST. VINCENT CATHOLIC
CHARITIES, MELISSA BUCK, CHAD
BUCK, and SHAMBER FLORE,

                 Intervening Defendants.
_____/

OPINION AND ORDER DENYING IN LARGE PART DEFENDANTS'
MOTIONS TO DISMISS (ECF NOS. 16 AND 19), AND JUST DISMISSING
THE CLAIMS OF PLAINTIFF LUDOLPH FOR LACK OF STANDING

     Plaintiffs filed their 42 U.S.C. § 1983 Complaint challenging Defendants Nick

Lyon (sued in his official capacity as the Director of the Michigan Department of

1

Health and Human Services "DHHS") and Herman McCall's (sued in his official capacity as the Executive Director of the Michigan Children's Services Agency "CSA") practice of permitting state-contracted and taxpayer-funded child placing agencies to use religious criteria to screen prospective foster and adoptive parents for children in the foster care system. Plaintiffs are prospective adoptive same-sex couples and individuals who have contacted certain faith-based Michigan adoption agencies and, based upon their same-sex status, been denied the state-contracted-for services to process their papers necessary for consideration for child placement by all adoption agencies. Plaintiffs allege that the refusal of these faith-based agencies to consider them as prospective adoptive parents violates their rights protected by the Establishment Clause of the First Amendment to the United States Constitution and also violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Plaintiffs seek a declaratory judgment that these practices violate the First and Fourteenth Amendments and seek an Order enjoining Defendants Lyon and McCall, in their official capacities, from contracting with or providing taxpayer funding to private child placing agencies that exclude same-sex couples from consideration as foster or adoptive parents or otherwise employ religious criteria in the screening of prospective foster and adoptive parents.

The Court has granted the motions of the Intervenor Defendants, St. Vincent Catholic Charities, Melissa Buck, Chad Buck, and Shamber Flore to intervene in this action. (ECF Nos. 31, 34.) The State Defendants and the Intervenor Defendants now move to dismiss the Plaintiffs' Complaint. (ECF Nos. 16, 19.) The Court also accepted and has considered (as appropriate to the stage of proceedings) the Group of 53 Michigan Legislators' Amicus Brief. (ECF No. 26.) The Court held oral argument on July 12, 2018, on both motions to dismiss. For the reasons that follow, the Court DENIES Defendants' motions to dismiss except that the Court GRANTS the motion to dismiss Plaintiff Jennifer Ludolph's claims for lack of standing.

## I.    FACTUAL BACKGROUND[1]

Plaintiffs allege that the DHHS is responsible for the approximately 13,000 children who are in the State's foster care system because they have been removed from their families by the State due to abuse or neglect or otherwise have become wards of the State. The State is responsible for finding these children appropriate

---

[1]    This factual background is taken virtually verbatim from the allegations of Plaintiff's Complaint and accepted as true, as required when the Court is considering a motion under Fed. R. Civ. P. 12(b)(6) for failure to state a claim and under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction due to want of standing. "'For purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.'" *Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

foster and adoptive families to care for them. (Compl. ¶ 2.) According to the allegations of the Complaint, the DHHS contracts out public adoption and foster care services to private agencies and pays these agencies with taxpayer funds to perform this government function. Some of these agencies refuse to accept prospective families headed by same-sex couples or to place children with families headed by same-sex parents based upon the agency's religious beliefs. DHHS has not prevented the agencies from engaging in this conduct. (Compl. ¶ 3.)

Plaintiffs Kristy and Dana Dumont and Erin and Rebecca Busk-Sutton are two prospective adoptive families that were turned away by state-contracted and taxpayer funded child placing agencies based on those agencies' religious objections to same-sex couples. Plaintiffs allege that these couples are ready, willing, and able to provide a "forever family" to children in the foster care system. Plaintiff Jennifer Ludolph was in the Michigan foster care system when she was a teenager and, as a taxpayer, she objects to taxpayer dollars funding child-placing agencies that turn away qualified families because of the agencies' religious objections to those families. The Complaint alleges that all Plaintiffs are Michigan taxpayers who object to their taxpayer dollars being used to pay for public child welfare services that are provided based on religious standards rather than professional child welfare standards and object to the use of taxpayer funds to underwrite and endorse religious beliefs to

4

which they do not subscribe. Plaintiffs allege that their claims concern only the State's provision of taxpayer-funded government services based on religious and discriminatory criteria and do not challenge any private agency's provision of private adoption services or use of non-public funds. (Compl. ¶¶ 5-8.)

## A. Plaintiffs' Allegations Regarding Michigan's Child Welfare System

According to the allegations of the Complaint, in a typical case the state Child Protective Services removes a child from a home for abuse or neglect and a court orders that the child be placed into foster care. If a child ultimately cannot be reunited with his or her parents and parental rights are terminated, DHHS seeks to find a permanent family for the child, typically through adoption. DHHS's responsibilities for such children include recruiting and identifying appropriate families to care for the children, either temporarily as foster parents or permanently as adoptive families. According to the allegations of the Complaint, DHHS performs this public function in part by contracting with private agencies that are licensed by DHHS's Division of Child Welfare Licensing ("DCWL") as "child placing agencies" to recruit, screen, train, and license prospective foster and adoptive parents and to place children in appropriate foster or adoptive homes, as authorized by Michigan statute, Mich. Compl. Laws §§ 722.11(1)(c), 722.115(3), 722.922. Plaintiffs allege that, although DHHS retains ultimate supervisory responsibility in all cases, much of the on-the-

ground foster care and adoption work is performed by taxpayer-funded child placing agencies. (Compl. ¶¶ 24-25.)

Plaintiffs allege that through rulemaking authorized by statute, DHHS has conferred authority on child placing agencies to make decisions regarding licensing foster parents and certifying adoptive parents, as well as placement of children into foster and adoptive homes. According to the allegations of the Complaint, child placement agencies have an obligation to maintain ongoing recruitment programs "to ensure an adequate number of suitable and qualified homes" to meet the needs of the children served by the agency. Under these administrative rules, agencies have substantial discretion in evaluating applicants as well as selecting appropriate placements for children into foster or adoptive homes. (Compl. ¶ 26, citing Mich. Admin. Code R. 400.12301(1), 400.12701, 400.12304(1), 400.12706, 400.12404, 400.12709.)

Plaintiffs allege that after an agency accepts a child's case from DHHS, it immediately begins receiving per diem compensation from the State. For example, the Complaint alleges, some agencies receive at least $40 per day from the State for each adoption case they handle. These payments cease after a child is permanently placed and the agencies receive a lump-sum payment after placement depending on the outcome of the case. (Compl. ¶ 27.) According to the allegations of the

Complaint, to fund the state's welfare system, the Michigan legislature annually makes appropriations for adoption and foster care services and the DHHS utilizes these appropriated funds to pay private child placing agencies under contract with the State to provide foster care and adoptive services. Plaintiffs allege that the DHHS has entered into adoption and foster care service contracts with over 100 private child placing agencies statewide, operating in multiple counties, many of whom are religiously affiliated. (Compl. ¶¶ 28-30.)

According to the allegations of the Complaint, the contracts entered into between DHHS and child placing agencies require the contracting agencies to comply with DHHS's non-discrimination statement, which mandates that agencies "will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, gender identity or expression, sexual orientation, political beliefs or disability." This requirement, Plaintiffs allege, "applies to all applications filed for adoption of [DHHS] supervised children, including [DHHS] supervised children assigned to a contracted agency." The contracts also require each contracting agency to "develop and implement a plan for adoptive home recruitment, retention, and support consistent with" DHHS's licensing standards applicable to the agency's license. (Compl. ¶¶ 31-32.)

Plaintiffs allege that families interested in fostering or adopting a child out of the foster care system must submit an application for a foster care license or to be certified to adopt. Each private child placing agency maintains a roster of families that it has licensed or certified that it generally uses for family placements for children assigned to its care. According to the allegations of the Complaint, the eligibility requirements for families interested in adopting from the foster care system are provided in the DHHS Adoption Program Statement, also known as Publication 255, which provides the same non-discrimination provision as the contracts with the child placing agencies and also state that "[t]he eligibility criteria for adoption of [DHHS]-supervised wards must not be more restrictive than the criteria in DHS Publication 255 when a contracted adoption agency is providing DHS adoption services." DHHS is contractually obligated to terminate its agreement with a child placing agency if the agency "[e]ngages in any conduct that may expose [DHHS] to liability" or "fails to cure a breach" of the agreement after receiving notice, and DHHS retains the right to terminate the agreement immediately "without penalty and for any reason." (Compl. ¶¶ 33-36.)

Plaintiffs allege that, although DHHS is aware that certain child placing agencies have refused to accept same-sex couples for processing necessary to foster or adopt children in the child welfare system, DHHS has not taken any remedial action

under its contracts against any agency for failure to abide by the DHHS non-discrimination statement or Publication 255, or the United States Constitution. (Compl. ¶ 37.)

### B. Plaintiffs' Allegations Regarding 2015 Michigan House Bills Nos. 4188, 4189, and 4190

For years, according to the allegations of the Complaint, some private agencies providing foster care and adoption services under contract with the State have refused to process same-sex couples seeking to qualify as foster or adoptive parents because of the agencies' religious beliefs. Starting as early as 2013, according to Plaintiffs' Complaint, members of the Michigan legislature attempted to introduce legislation that would codify and authorize the practice of permitting agencies to turn away same-sex couples on the basis of religious objection. Those early efforts at passing legislation did not succeed. In the 2015-2016 Legislative session, Michigan House Bills 4188, 4189, and 4190 presented the issue again. According to the allegations of the Complaint, during a hearing before the House on February 18, 2015, the director of clinical services at Intervenor Defendant St. Vincent confirmed that the organization would not work with gay and lesbian prospective parents, explaining that when prospective parents to whom they were religiously opposed approached them: "If they let us know that they're unmarried, or they're gay or lesbian, we immediately

recommend, make a referral to another agency." Allegedly the President of another faith-based agency, Bethany, asserted that to require Bethany to adhere to principles of non-discrimination would present them with "an untenable choice" of "choos[ing] between their desire to help children and families and their fidelity to their religious principles." The President of Bethany stated that "House Bills 4188-4190 are necessary" to "codify into state law what has been in practice," and threatened that "if statewide policy changes in a way that would force Catholic agencies to choose between violating strongly held religious beliefs or ceasing cooperation with the state, the agencies will cease to cooperate." Plaintiffs also allege that the President and CEO of the Michigan Catholic Charities also weighed in on the issue by letter to Governor Rick Snyder stating that Catholic agencies "handl[e] approximately twenty percent of the active foster care and adoption cases in Michigan," and expressed concern that there were objections to "the religious manner by which faith-based child placement agencies operate." (Compl. ¶¶ 38-43, 45-46.)

According to the allegations of the Complaint, the Michigan House of Representatives passed the Bills in March, 2015 and on June 10, 2015, the Michigan Senate passed the bills, which were signed into law the following morning by Governor Snyder as 2015 Public Acts 53, 54, and 55, codified at Mich. Comp. Laws § 400.5a, 722.124c, 722.124f, and 710.23g. (Compl. ¶¶ 44, 47.) The statutes provide

in relevant part that, "[t]o the fullest extent permitted by state and federal law, a child placing agency shall not be required to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs." Mich. Comp. Laws § 722.124e(2). Additionally, the statute provides that, "[t]o the fullest extent permitted by state and federal law, the state or local unit of government shall not take an adverse action against a child placing agency on the basis that the child placing agency has declined or will decline to provide any services if those services conflict with, or provide any services under circumstances that conflict with, the child placing agency's sincerely held religious beliefs." *Id.* § 722.124e(3). Under the statute, "services" are defined to "include[] any service that a child placing agency provides except foster care case management and adoption services provided under a contract with [DHHS]." *Id.* § 722.124e(7)(b). The Plaintiffs allege that some child placing agencies have interpreted these statutes as permitting taxpayer-funded state-contracted child placing agencies to turn away prospective families for children in foster care based on religious criteria and the State has allowed this practice to occur. (Compl. ¶¶ 48-49.)

### C. Plaintiffs' Allegations Regarding Harm to Children Resulting From the Defendants' Authorization of Religious-Based Exclusions by Child Placing Agencies

Plaintiffs allege that there is a shortage of foster and adoptive families in

Michigan and that as a result of this shortage, some children in State custody have and may continue to have multiple temporary placements before a suitable permanent home is found while other children may have to be separated from their siblings or placed in foster homes far from their school and community and other children may have to be placed in group homes and may reach the age of majority without ever being placed with a permanent family. (Compl. ¶¶ 51-52.) Plaintiffs allege that each time a prospective parent who is able to provide a loving and caring family for a child is turned away by a child placing agency because of a religious objection to their sexual orientation (or any other religious objection) the pool of families available for the children in the system diminishes, reducing children's option for placement. (Compl. ¶ 53.)

According to the allegations of Plaintiffs' Complaint, every major professional organization dedicated to children's welfare, including the Child Welfare League of America, the National Association of Social Workers, the National Adoption Center, the American Psychological Association, the American Psychiatric Association, the American Academy of Family Physicians, the American Academy of Pediatrics, and the American Medical Association, affirmatively states that gay and lesbian parents are as likely as heterosexual parents to provide supportive and healthy environments for their children and opposes any discrimination based on sexual orientation in

matters of adoption and foster care. Plaintiffs allege that the loss of these potentially

qualified families exacerbates the shortage of potential foster and adoptive families,

resulting in greater costs to the State welfare system and the result that some children

who otherwise would be matched with a loving same-sex family may be denied the

family that best matches their individual needs. (Compl. ¶¶ 54-56.)

## II.  LEGAL STANDARDS

### A.  Standing: Fed. R. Civ. P. 12(b)(1)

Article III of the United States Constitution defines the power of federal courts

and restricts that power to resolving "cases or controversies." A plaintiff who lacks

standing does not present a case or controversy. *Lujan v. Defenders of Wildlife*, 504

U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and

unchanging part of the case-or-controversy requirement of Article III."). "'The party

invoking federal jurisdiction bears the burden of establishing these elements.'"

*Parsons v. U.S. Dept of Justice*, 801 F.3d 701, 710 (6th Cir. 2015). "At the pleading

stage, general factual allegations of injury resulting from the defendant's conduct may

suffice, for on a motion to dismiss we presume that general allegations embrace those

specific facts that are necessary to support the claim." *Parsons*, 801 F.3d at 710

(quoting *Lujan*, 504 U.S. at 561). "When considering whether pleadings make out a

justiciable case for want of standing, our analysis must be confined to the four corners

of the complaint." *Id*. at 706.

However, since the elements necessary to establishing standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, while the Court may accept as true the general allegations of the Plaintiffs' Complaint regarding these elements at the pleading stage, Plaintiffs must, at later stages of the litigation, support these allegations with the "manner and type" of evidence demanded at those later stages. *Id.* Plaintiffs must demonstrate standing separately for each claim they assert. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) ("[A] plaintiff must demonstrate standing for each claim he seeks to press.")**.**

## B. Failure to State A Claim: Fed. R. Civ. P. 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) allows for the dismissal of a case where the complaint fails to state a claim upon which relief can be granted. When reviewing a motion to dismiss under Rule 12(b)(6), a court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Handy-Clay v. City of Memphis*, 695 F.3d 531, 538 (6th Cir. 2012). To state a claim, a complaint must

provide a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "[T]he complaint 'does not need detailed factual allegations' but should identify 'more than labels and conclusions.'" *Casias v. Wal–Mart Stores, Inc.*, 695 F.3d 428, 435 (6th Cir. 2012) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). The court "need not accept as true a legal conclusion couched as a factual allegation, or an unwarranted factual inference." *Handy-Clay*, 695 F.3d at 539 (internal citations and quotation marks omitted). In other words, a plaintiff must provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555-56. The Sixth Circuit has recently that "[t]o survive a motion to dismiss, a litigant must allege enough facts to make it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

In ruling on a motion to dismiss, the Court may consider the complaint as well as (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims, (2) matters of which a court may take judicial notice (3) documents that are a matter of public record, and (4) letters that constitute decisions

of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015) ("Documents outside of the pleadings that may typically be incorporated without converting the motion to dismiss into a motion for summary judgment are public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies.") (Internal quotation marks and citations omitted); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("We have taken a liberal view of what matters fall within the pleadings for purposes of Rule 12(b)(6). If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings. . . . [C]ourts may also consider public records, matters of which a court may take judicial notice, and letter decisions of governmental agencies."); *Greenberg v. Life Ins. Co. Of Virginia*, 177 F.3d 507, 514 (6th Cir. 1999) (finding that documents attached to a motion to dismiss that are referred to in the complaint and central to the claim are deemed to form a part of the pleadings). Where the claims rely on the existence of a written agreement, and plaintiff fails to attach the written instrument, "the defendant may introduce the pertinent exhibit," which is then considered part of the pleadings. *QQC, Inc. v. Hewlett-Packard Co*., 258 F. Supp. 2d 718, 721 (E.D. Mich. 2003). "Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document." *Weiner v. Klais and Co., Inc*., 108 F.3d 86, 89 (6th Cir. 1997).

## III.    ANALYSIS

Standing must be demonstrated separately as to each claim of the Complaint. *DaimlerChrysler*, 547 U.S. at 352.  The Dumonts and the Busk-Suttons ("the Prospective Parent Plaintiffs") claim that they have standing to bring both their Equal Protection and Establishment Clause claims based upon "being turned away" by certain faith-based child placing agencies when they sought to adopt.   (ECF No. 28, Pls.' Resp. to State Defs.' Mot. 9-10, PgID 641-42.) All Plaintiffs, including Ms. Ludolph, claim to separately have standing to bring their Establishment Clause claims as Michigan taxpayers based upon "the disbursement of taxpayer funds spent under Michigan's statutory child welfare system."  (*Id.* at 10, PgID 642.)

### A.    The Prospective Parent Plaintiffs Have Adequately Alleged General Article III Standing for Their Establishment Clause and Equal Protection Claims.

The Prospective Parent Plaintiffs claim to have general Article III standing to bring both their Equal Protection and Establishment Clause claims based upon their allegation that they contacted certain "state-contracted" child placing agencies and were turned away because of the agencies' religious objections to same-sex couples. (ECF No. 28, Pls.' Resp. to State Defs.' Mot. 9.)

In order to establish Article III standing for either their Equal Protection or their Establishment Clause claims,  Plaintiffs must establish the following elements:

17

First, Plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Parsons*, 801 F.3d at 710 (quoting *Lujan*, 504 U.S. at 560-61). "The injury must be to a legally cognizable right." *Id*.

### 1. The Prospective Parent Plaintiffs have adequately alleged injury-in-fact.

Here the Prospective Parent Plaintiffs assert Equal Protection and Establishment Clause violations and claim "both stigmatic and practical injuries" allegedly stemming from the "barrier to adopting a child out of the state-run foster care system," which Plaintiffs allege "were caused by the State of Michigan and are redressable by this Court." (Pls.' Resp. to State Defs.' Mot. 1-2.) "Stigmatization also constitutes an injury in fact for standing purposes." *Parsons*, 801 F.3d at 712 (citing *Heckler v. Mathews*, 465 U.S. 728, 739–40 (1984)). "[A] claim of stigmatic injury, or denigration, suffered by all members of a [] group," i.e. "abstract stigmatic injury," is not "judicially cognizable" for purposes of standing. *Allen v. Wright*, 468 U.S. 737, 754, 756 n. 22 (1984), abrogated on other grounds in *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc*., ___ U.S. ____, 134 S.Ct. 1377 (2014). However, such "stigmatic injury" can "accord[] a basis for standing [] to 'those persons who are personally denied equal treatment' by the challenged discriminatory conduct." 468 U.S. at 755 (quoting *Heckler*, 465 U.S. at 739-40).[2] In *Allen*, an equal protection case, the plaintiffs filed suit against the IRS for its failure to deny tax exempt status to private schools that discriminated on the basis of race. The plaintiffs were parents of African American children who attended public school who claimed that they were "harmed directly by the mere fact of Government financial aid to discriminatory private schools." *Id*. at 752. The Supreme Court found that the parents lacked standing because they had never claimed the exemption and thus had not "personally been denied equal treatment." *Id*. at 755. The Prospective Parent Plaintiffs, by contrast, allege stigmatic injury because they were personally turned away by certain

---

[2] It is not clear that the same "stigmatic injury" will always suffice equally as the foundation for standing to bring both an Establishment Clause and an Equal Protection Claim. *See, e.g., Moore v. Bryant*, 853 F.3d 245, 249-50 (5th Cir. 2017) (collecting cases "reject[ing] attempts to cross-pollinate Equal Protection Clause standing jurisprudence with Establishment Clause cases"). The Fifth Circuit draws on the distinction between *Allen* and its progeny on the one hand, which require a personal denial of equal treatment, and the Establishment Clause cases which find sufficient basis for standing in injuries caused by "unwanted and unwelcome" exposure to a religious display – an injury that would not suffice under the Equal Protection clause. In this case, Plaintiffs have claimed injury from stigma caused by an actual incident directed to them personally, being turned away from certain faith-based child placing agencies, and not from abstract stigmatic harm generally to same-sex couples. These allegations would satisfy the more stringent of the two tests at this pleading stage.

faith-based child placing agencies. The Prospective Parent Plaintiffs suggest that they are not just part of a larger group that claims unequal treatment – they personally encountered the unequal treatment about which they complain through that act of being turned away as prospective adoptive parents. They have alleged injury-in-fact with respect to their Equal Protection claim.

The Prospective Parent Plaintiffs also argue that courts have found standing based on stigmatic harm in Establishment Clause cases. *Moss v. Spartanburg Cnty. Sch. Dist. Seven*, 683 F.3d 599 (4th Cir. 2012), was a suit under section 1983 filed against a school district that, acting pursuant to statutory authority, "adopted a policy allowing public school students to receive academic credits for off-campus religious instruction offered by private educators." 683 F.3d at 601. The court reasoned that plaintiffs, none of whom were directly injured by the policy in terms of grades or credits, could not merely claim that they were "spiritually affronted" as a result of "unwelcome" interaction with religion. The court held that "spiritual stake" alone is insufficient to confer standing. *Id*. at 605-06. A plaintiff's simple "abstract knowledge" of the policy and "feel[ing] like an outsider" (although sharing the Christian faith) upon learning of the policy were insufficient where there was no evidence that the plaintiff had received or encountered promotional materials. *Id*. at 606. On the other hand, a different plaintiff in *Moss*, who was not Christian and who

did receive promotional materials and discussed the materials with family, viewed the policy as favoritism in the school district for Christianity that made their family feel like outsiders, and did thereby allege sufficient injury in fact: "Feelings of marginalization and exclusion are cognizable forms of injury, particularly in the Establishment Clause context, because one of the core objectives of modern Establishment Clause jurisprudence has been to prevent the State from sending a message to non-adherents of a particular religion "that they are outsiders, not full members of the political community." *Id.* at 607.

Again, the Prospective Parent Plaintiffs allege stigmatic injury because they were personally turned away by certain faith-based child placing agencies – they allege that they personally encountered the stigmatic harm about which they complain through that act of being turned away as prospective adoptive parents. They have alleged injury-in-fact with respect to their Establishment Clause claim.

The Prospective Parent Plaintiffs also allege that they encountered "practical injuries" in addition to "stigmatic injuries" because the refusal by certain child placing agencies to accept them for screening "'makes it more difficult for [them] to obtain a benefit than it is for'" opposite-sex couples. (Pls.' Resp. to State Defs.' Mot. 10, PgID 642) (quoting *Northeastern Fla. Chapter of Assoc. Gen'l Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993)). Indeed, *City of*

*Jacksonville* does instruct that "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, a member of the former group seeking to challenge the barrier need not allege that he would have obtained the benefit but for the barrier in order to establish standing." 508 U.S. at 666. "The 'injury in fact' in an equal protection case of this variety is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Id.*

Plaintiffs allege in their Complaint that faith-based agencies handle "20% of the active foster care and adoption cases in Michigan." (Compl. ¶ 26.) Thus it is reasonable to infer that the ability of faith-based agencies to employ religious criteria as a basis to turn away same-sex couples erects at least a 20% barrier to the Prospective Parent Plaintiffs' ability to adopt or foster a child in the State of Michigan. The Prospective Parent Plaintiffs have sufficiently alleged an injury separate from the stigmatic harm they claim to have suffered – the unequal treatment they received as a result of being turned away based upon their status as a same-sex couple, a barrier that makes "it more difficult for [same-sex couples to adopt] than it is for [heterosexual couples]." *City of Jacksonville*, 508 U.S. at 666. Defendants continue to assert that the Prospective Parent Plaintiffs had options at many other agencies but (1) this factual assertion is not alleged in Plaintiffs' Complaint and

indeed the opposite is alleged; and (2) Plaintiffs' need not demonstrate that they would have been completely foreclosed – only that they could not compete for the right to adopt on the same footing as everyone else. Their Complaint sufficiently alleges such an injury.

Finally, Defendants assert, relying on *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816 (1977) and *Renfro v. Cuyahoga County Dep't of Human Services*, 884 F.2d 943 (6th Cir. 1989), that Plaintiffs have no fundamental right to be foster or adoptive parents and therefore fail to allege a cognizable injury. (State Defs.' Mot. 12, PgID 75; State Defs.' Reply 1, PgID 667). Plaintiffs do not contest this fact and respond that they are not claiming "a liberty interest protected by substantive due process," as was at issue in *Smith* and *Renfro*. They argue instead that their Equal Protection and Establishment Claims are premised on injuries they suffered as a result of the State Defendants' practice of entering into contracts for the provision of state child welfare services with child placing agencies that use religious criteria to turn away prospective parents, causing Plaintiffs stigmatic harm and denying Plaintiffs the same opportunities to work with a child placing agency that is available to every other family in Michigan seeking to adopt. Their Complaint does not challenge any particular agency's decision not to work with them. (Pls.' Resp. to State Defs.' Mot. 9 n. 9, PgID 641.)

23

The Plaintiffs have adequately alleged injury in fact for both their Establishment Clause and Equal Protection claims.

**2.      The Prospective Parent Plaintiffs have adequately alleged that their injury is fairly traceable to the Defendants.**

The State Defendants next assert that Plaintiffs' claimed injuries are not "fairly traceable" to, or "caused by" these Defendants' conduct because the child placing agencies, and not the State Defendants, are the parties alleged to have turned them away as prospective adoptive parents. For their part, these Defendants argue, the contracts that they maintain with the child placing agencies prohibit those agencies from discriminating against potential applicants. (State Defs. Mot. 13.) Plaintiffs respond that because the State contracts with child placement agencies and accepts that certain agencies may permissibly employ religious criteria to turn away prospective families headed by same-sex couples, the injury is fairly traceable to them as enablers of this conduct.

In *Parsons*, *supra*, the Sixth Circuit disagreed with the district court's conclusion that this traceability element was lacking "because the third-party law enforcement officials exercise independent judgment in committing the alleged injuries" by stopping/detaining/searching the Juggalos based upon their alleged gang affiliations:

While the Court [in *Lujan*] did enumerate a heightened standard for demonstrating causation in the case of indirect injury caused by a third party, it makes clear that such a standard is satisfied where the plaintiff was able to "adduce facts showing that [the third-party's] choices have been or will be made in such manner as to produce causation and permit redressability of injury."

*Parsons*, 801 F.3d at 713 (quoting *Lujan*, 504 U.S. at 562). "The causation need not be proximate . . . [and] the fact that an injury is indirect does not destroy standing as a matter of course." *Id*. at 713. *See Warth*, 422 U.S. at 504 ("The fact that the harm to petitioners may have resulted indirectly does not in itself preclude standing.").

In *Parsons* the Sixth Circuit concluded that plaintiffs, members of a musical group (the Insane Clown Posse) who called themselves "Juggalos," were designated by the National Gang Intelligence Center ("the NGIC") – "an informational center operating under the Federal Bureau of Investigation" – as a "hybrid gang." 801 F.3d at 705. Plaintiffs alleged that this designation caused them to be stopped/searched/detained, in violation of their First and Fifth Amendment rights, by state and local law enforcement officers who were motivated by the NGIC's designation of the Juggalos as a criminal gang. *Id*. at 706. The Sixth Circuit found that their claims of injury to their reputations and stigmatization allegedly caused by the conduct of the law enforcement officers satisfied the "injury" prong and that allegations that their injuries were caused "at least in part" by the agency's designation

of the Juggalos as a "gang" satisfied the traceability/causation prong. *Id*. at 713.

In this case, according to the allegations of the Complaint, DHHS permits certain child placing agencies to use religious eligibility criteria when screening prospective foster and adoptive families. The contracts with these agencies acknowledge an agency's rights that are protected by the religious belief exemption provided in PA 53, which the faith-based agencies rely on to turn away prospective families headed by same-sex couples because of the agency's religious beliefs. (Compl. ¶ 78.) Defendants admit that, "as Michigan law requires," their contracts with the child placing agencies "expressly incorporate and protect a CPA's rights under P.A. 53." (State Defs.' Mot. Ex. 1, 2016 Adoption Services Agreement Between DHHS and St. Vincent, § 2.9(e).) Here, the Plaintiffs have alleged that their injuries were caused by the State Defendants' contractual and actual practice of permitting a child placing agency to refuse to work with a same-sex couple. Thus, Plaintiffs have alleged facts that "link" the State Defendants to their injuries by alleging that the State Defendants' conduct enabled the child placing agencies to take the actions that they did with regard to same sex couples. As the Sixth Circuit observed in *Parsons*: "The Juggalos' allegations link the 2011 NGTA Report to their injuries by stating that the law enforcement officials themselves acknowledged that the DOJ gang designation had caused them to take the actions in question. At this

initial stage of the case, the Juggalos' allegations must suffice." 801 F.3d at 714.

Even if the State Defendants did not direct the child placing agencies to exclude same-sex couples, "it is still possible to motivate harmful conduct without giving a direct order to engage in said conduct." *Id.* "In the nebulous land of 'fairly traceable,' where causation means more than speculative but less than but-for, the allegation that a defendant's conduct was a motivating factor in the third party's injurious actions satisfies the requisite standard." *Id.* at 714.

Here, Plaintiffs allege that because of the State Defendants' practice of continuing to enter into contracts that allow the child placing agencies to use religious criteria in excluding same-sex couples, they have suffered both stigmatic and practical harm. This injury is at least "fairly traceable" to the State Defendants based on the allegations before the Court.

### 3. The Prospective Parent Plaintiffs have adequately alleged that their injuries are redressable by a favorable decision.

With regard to the final element, redressability, Defendants argue that an order enjoining the Defendants from contracting with faith-based agencies that only work with married, opposite-sex couples will not redress the Plaintiffs' claimed injuries because it will leave the Plaintiffs right where they are – without the ability to seek the services of the child placement agencies that refused to work with them because those

agencies will be forced to close and will be unable to offer any services at all. (State

Defs.' Mot. 13.) Plaintiffs respond that Defendants cannot rely on the factual

assertion that these faith-based agencies will no longer be able to provide services

because those allegations are not contained in Plaintiffs' Complaint. In any event, the

Plaintiffs argue, the relief they seek is not to work with a particular child placing

agency but to be able to work with *any* child placing agency on equal footing with all

other prospective adoptive couples, regardless of their sexual orientation.

Specifically, Plaintiffs ask the Court to:

> A. Declare . . . that the State's practice of allowing state-contracted,
> taxpayer-funded child placing agencies to disqualify prospective families
> headed by same-sex couples based on agencies' religious beliefs violates
> the First and Fourteenth Amendments to the United States Constitution;
>
> B. Enter an order enjoining Defendants, in their official capacities, from
> contracting with or providing taxpayer funding to private child placing
> agencies that exclude same-sex couples from consideration as foster or
> adoptive parents or otherwise employ religious criteria in decisions
> regarding the screening of prospective foster and adoptive parents . . .
>
> C. Enter an order directing Defendants, in their official capacities, to
> ensure that lesbian and gay individuals and couples are treated the same
> as heterosexual individuals and couples by state-contracted child placing
> agencies.

(Compl. Relief Requested, PgID 21-22.)

"[I]t need not be likely that the harm will be *entirely* redressed, as partial redress

can also satisfy the standing requirement." *Parsons*, 801 F.3d at 716 (citing *Meese*

*v. Keen*, 481 U.S. 465, 476 (1987)) (alteration in original). Here, according to the allegations of Plaintiffs' Complaint, the relief requested would be likely to redress Plaintiffs' injuries stemming from alleged stigmatism and barriers to adoption because they plausibly allege in their Complaint that there will in fact be *more* options available to the Plaintiffs and they will no longer suffer the humiliation they allege they suffer now, if they are awarded the relief they seek. "It can scarcely be doubted that, for a plaintiff who is injured or faces the threat of future injury due to illegal conduct ongoing at the time of a suit, a sanction that effectively abates that conduct and prevents its recurrence provides a form of redress." *Parsons*, 801 F.3d at 716. "While we cannot be certain whether and how the declaration sought by the [Plaintiffs] will affect third-party [child placement agencies], it is reasonable to assume a likelihood that the injury would be partially redressed where, as here, the [Plaintiffs] have alleged that the [child placement agencies] violated their rights because of [the State Defendants' conduct]." *Id.* at 717.

For similar reasons, Intervenor Defendants' reliance on *Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26 (1976) is inapt. In *Simon*, a group of indigent patients and several welfare organizations brought suit against the Secretary of the Treasury and the Commissioner of Insurance asserting that the issuance of a certain Revenue Ruling, that afforded favorable tax treatment to

nonprofit hospitals that offered only emergency room treatment to indigents, caused the hospitals to deny the indigent patients certain services. *Id*. at 28. The organizations were properly dismissed based on a lack of organizational standing and the Supreme Court limited its analysis to the claims of the individual indigent patients, at least some of whom allegedly were denied services by a hospital because of their inability to pay. No hospitals were named as defendants.

The Supreme Court concluded that the individual indigent patients lacked standing to sue. The Court reasoned that because the complaint alleged only that the Revenue Ruling "encouraged" hospitals to deny services to indigents, and because it was equally plausible that the hospitals would elect to forego favorable tax treatment rather than face "the undetermined financial drain of an increase in the level of uncompensated care," *id*. at 43, the patients failed to carry their burden "[t]o establish that, in fact, the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." *Id*. at 44-45. Because "[s]peculative inferences" were necessary to connect the patients' injuries to the effect of the Revenue Ruling, and because the complaint suggested "no substantial likelihood that victory in [the] suit would result in respondents receiving the hospital treatment they desire[d]," there was insufficient directness of injury and therefore no basis for standing. *Id*. 45-46.

As an initial observation, and as Plaintiffs point out, *Simon* did not involve religious-based discrimination and it did not involve a State partnering with a private entity to provide government services in the State's stead. In any event, in this case Plaintiffs have alleged that they suffered stigmatic and practical harm as a result of the State's practice of permitting faith-based agencies to turn them away due to their sexual orientation. And the faith-based agencies concede that their ability to turn away same sex couples and continue to partner with the State is dependent upon the religious belief protection they have been granted by the State. But Plaintiffs are not seeking the services of any particular child placing agency – they are asking that the barriers that they now face to adopting a child based on their sexual orientation be removed and they seek the opportunity to adopt a child based on the same criteria applied to every other family seeking to adopt in Michigan. If they are granted the relief they seek, those barriers will be eliminated and they will be able to pursue adoption on equal footing with other Michigan families. No speculative inferences are necessary here to conclude that the relief requested will result in the Plaintiffs receiving the dignity and equal treatment they seek.

Finally, relying on *Fieger v. Michigan Supreme Court*, 553 F.3d 955 (6th Cir. 2009), the Intervenor Defendants argue that a higher pleading standard governs the inquiry when, as here, a plaintiff seeks injunctive relief. Plaintiffs have met that

burden here. Plaintiffs allege that they continue to suffer from their inability to work with any child placing agency of their choosing and that if the Court grants the relief they seek, breaking down the barriers to adoption that they now face, there will be greater opportunity for them to adopt, plausibly suggesting that they will personally benefit in a tangible way from the requested relief. Defendants urge that the facts are otherwise and that Plaintiffs' options will be the same or fewer if the Court grants the requested relief. The Court cannot accept the Defendants' controverting factual assertions at this stage of proceedings. However, as the Court previously remarked, since the elements necessary to establishing standing "are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, while the Court may accept as true the general allegations of the Plaintiffs' Complaint regarding these elements at the pleading stage, Plaintiffs must, at later stages of the litigation, support these allegations with the "manner and type" of evidence demanded at those later stages. *Id*.

The Prospective Parent Plaintiffs have adequately alleged general Article III standing to proceed further with both their Establishment Clause and Equal Protection

Claims.

**B.      Plaintiffs Have Failed to Establish Taxpayer Standing to Assert Their Establishment Clause Claims.**

Defendants argue that because Plaintiffs challenge discretionary executive activity, i.e. the "Defendants' practice of contracting with faith-based [child placing agencies]," (State Defs.' Mot. 11, PgID 74) rather than challenging legislatively mandated spending, Plaintiffs cannot establish taxpayer standing to assert their Establishment Clause claim.[3] The analysis necessarily starts with the long-established premise that taxpayers as taxpayers do not have standing to challenge the constitutionality of a statute or government practice:

> In *Frothingham v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923), this Court ruled that a federal taxpayer is without standing to challenge the constitutionality of a federal statute. That ruling has stood for 45 years as an impenetrable barrier to suits against Acts of Congress brought by individuals who can assert only the interest of federal taxpayers.

*Flast v. Cohen*, 392 U.S. 83, 85 (1968).  In *Flast*, the Court announced a two-part "nexus" test to determine "the standing of individuals who assert only the status of federal taxpayers and who challenge the constitutionality of a federal spending program:"

---

[3] The Prospective Parent Plaintiffs assert taxpayer standing as an alternate basis for their Establishment Clause Claim and *not* as a basis for their Equal Protection Claim. Plaintiff Jennifer Ludolph relies solely on taxpayer standing as a basis for her claims.

The nexus demanded of federal taxpayers has two aspects to it. First, the taxpayer must establish a logical link between that status and the type of legislative enactment attacked. Thus, a taxpayer will be a proper party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, s 8, of the Constitution. It will not be sufficient to allege an incidental expenditure of tax funds in the administration of an essentially regulatory statute. This requirement is consistent with the limitation imposed upon state-taxpayer standing in federal courts in *Doremus v. Board of Education*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952). Secondly, the taxpayer must establish a nexus between that status and the precise nature of the constitutional infringement alleged. Under this requirement, the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, s 8. When both nexuses are established, the litigant will have shown a taxpayer's stake in the outcome of the controversy and will be a proper and appropriate party to invoke a federal court's jurisdiction.

392 U.S. at 102-03.

In *Hein v. Freedom From Religion Foundation, Inc.*, 551 U.S. 587 (2007), the Supreme Court acknowledged the narrow exception to the general rule against taxpayer standing announced in *Flast*: "In *Flast*, the Court carved out a narrow exception to the general constitutional prohibition against taxpayer standing." 551 U.S. at 602. The Court in *Hein* noted that "[t]he expenditures challenged in *Flast* [] were funded by a specific congressional appropriation and were disbursed to private schools (including religiously affiliated schools) pursuant to a direct and unambiguous congressional mandate." 551 U.S. at 604. In *Hein*, plaintiffs challenged the use of

federal funds to pay for conferences held or speeches given as part of President

George W. Bush's "Faith-Based and Community Initiatives" program that "used

'religious imagery' and 'praised the efficacy of faith-based programs in delivering

social services.'" 551 U.S. at 592. The Supreme Court held that because the

conferences and speeches were paid for out of general Executive branch

appropriations, and not specific congressional enactments, the case fell outside the

narrow exception created in *Flast*:

> The link between congressional action and constitutional violation that
> supported taxpayer standing in *Flast* is missing here. Respondents do not
> challenge any specific congressional action or appropriation; nor do they
> ask the Court to invalidate any congressional enactment or legislatively
> created program as unconstitutional. That is because the expenditures at
> issue here were not made pursuant to any Act of Congress. Rather,
> Congress provided general appropriations to the Executive Branch to
> fund its day-to-day activities. These appropriations did not expressly
> authorize, direct, or even mention the expenditures of which respondents
> complain. Those expenditures resulted from executive discretion, not
> congressional action.

551 U.S. at 605 (footnote omitted). In *Hein*, the Supreme Court distinguished its

earlier decision in *Bowen v. Kendrick*, 487 U.S. 589 (1988):

> *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520
> (1988), on which respondents rely heavily, is not to the contrary. In that
> case, we held that the taxpayer-plaintiffs had standing to mount an
> as-applied challenge to the Adolescent Family Life Act (AFLA), which
> authorized federal grants to private community service groups including
> religious organizations. The Court found "a sufficient nexus between the
> taxpayer's standing as a taxpayer and the congressional exercise of taxing

and spending power," notwithstanding the fact that "the funding authorized by Congress ha[d] flowed through and been administered" by an Executive Branch official. *Id.*, at 620, 619, 108 S.Ct. 2562.

But the key to that conclusion was the Court's recognition that AFLA was "at heart a program of disbursement of funds pursuant to Congress' taxing and spending powers," and that the plaintiffs' claims "call[ed] into question how the funds authorized by Congress [were] being disbursed pursuant to the AFLA's statutory mandate." *Id.*, at 619–620, 108 S.Ct. 2562 (emphasis added). AFLA not only expressly authorized and appropriated specific funds for grantmaking, it also expressly contemplated that some of those moneys might go to projects involving religious groups. *See id.*, at 595–596, 108 S.Ct. 2562; *see also id.*, at 623, 108 S.Ct. 2562 (O'Connor, J., concurring) (noting the "partnership between governmental and religious institutions contemplated by the AFLA"). Unlike this case, *Kendrick* involved a "program of disbursement of funds pursuant to Congress' taxing and spending powers" that "Congress had created," "authorized," and "mandate[d]." *Id.*, at 619–620, 108 S.Ct. 2562.

551 U.S. at 606-07 (footnote omitted).

Intervenor Defendants direct the Court's attention to *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125 (2011), where the Supreme Court reiterated the narrowness of the *Flast* holding and again focused the analysis on whether plaintiff could point to a specific legislative apportionment for religious purposes. *Winn* involved the issue of whether certain Arizona tuition tax credits, which allowed Arizona taxpayers to make contributions to school tuition organizations ("STOs") and to receive up to a $500 tax credit for the contribution, violated the Establishment Clause. 563 U.S. at 129. A group of Arizona taxpayers challenged the tax credit

based upon the allegation that "STOs use these contributions to provide scholarships to students attending private schools, many of which are religious." *Id*. The Court noted "at the outset that . . . *Flast's* holding provides a narrow exception to the general rule against taxpayer standing." 563 U.S. at 138. The Court then reiterated *Flast's* "two conditions" for taxpayer standing: "The first condition is that there must be a 'logical link' between the plaintiff's taxpayer status 'and the type of legislative enactment attacked.'" 563 U.S. at 138 (quoting *Flast*, 392 U.S. at 102). The Court noted that "[i]n the decades since *Flast*, the Court has been careful to enforce this requirement," citing *Hein, supra*, as an example where the Court found "no standing under *Flast* to challenge federal executive actions funded by general appropriations." *Winn*, 563 U.S. at 139. The second *Flast* condition as explained in *Winn* "is that there must be 'a nexus' between the plaintiff's taxpayer status and 'the precise nature of the constitutional infringement alleged.'" 563 U.S. at 139 (quoting *Flast*, 392 U.S. at 102). "This condition was deemed satisfied in *Flast* based on the allegation that Government funds had been spent on an outlay for religion in contravention of the Establishment Clause." *Winn*, 563 U.S. at 139. The Court in *Winn* explained *Flast's* ultimate rationale as follows:

> After stating the two conditions for taxpayer standing, *Flast* considered them together, explaining that individuals suffer a particular injury for standing purposes when, in violation of the Establishment Clause and by

means of "the taxing and spending power," their property is transferred through the Government's Treasury to a sectarian entity. 392 U.S., at 105–106, 88 S.Ct. 1942. As *Flast* put it: "The taxpayer's allegation in such cases would be that his tax money is being extracted and spent in violation of specific constitutional protections against such abuses of legislative power." *Id.*, at 106, 88 S.Ct. 1942. *Flast* thus "understood the 'injury' alleged in Establishment Clause challenges to federal spending to be the very 'extract[ion] and spen[ding]' of 'tax money' in aid of religion alleged by a plaintiff." *DaimlerChrysler*, 547 U.S., at 348, 126 S.Ct. 1854 (quoting *Flast*, 392 U.S., at 106, 88 S.Ct. 1942). "Such an injury," *Flast* continued, is unlike "generalized grievances about the conduct of government" and so is "appropriate for judicial redress." *Id.*, at 106, 88 S.Ct. 1942.

*Winn*, 563 U.S. at 139-40. Ultimately, the Supreme Court found no taxpayer standing in *Winn*.

In *Murray v. United States Dept of Treasury*, 681 F.3d 744 (6th Cir. 2012), the Sixth Circuit summarized Supreme Court precedent on the issue of taxpayer standing, discussing *Flast*, *Hein*, *Bowen*, among others as well as the Sixth Circuit's decisions in *Pedreira v. Kentucky Baptist Homes for Children, Inc.*, 579 F.3d 722 (6th Cir. 2009) and *American Atheists, Inc. v. City of Detroit Downtown Development Authority*, 567 F.3d 278 (6th Cir. 2009), distilling from these cases the proposition that "the *Flast* exception does not extend to suits challenging executive-branch expenditures of unearmarked funds." *Murray*, 681 F.3d at 751 (quoting *American Atheists*, 567 F.3d at 286). The Sixth Circuit in *Murray*, again drawing on this same precedent, stated that "a taxpayer-plaintiff has standing to challenge an executive-

branch disbursement of funds only if the appropriating statute expressly contemplates the disbursement of [government] funds to support religious groups or activities." *Id*. The Sixth Circuit declined the invitation to "adopt the reasonable inference" as suggested by the plaintiffs, that Congress's general awareness of the fact that some of the funds disbursed by the Treasury Secretary following the acquisition by the Treasury Department of a controlling stake in a financially troubled entity that was known to be selling financial instruments specifically targeted toward compliance with Sharia law, was sufficient to find that the challenged legislation contemplated support for religious activities. *Id*. at 751-52.

Plaintiffs urge the Court to find taxpayer standing relying on *Pedreira, supra*. In *Pedreira*, the Kentucky Baptist Homes for Children, Inc. ("KBHC"), a sectarian organization providing placement resources for at-risk and abused and neglected children, received approximately $12.5 million per year from the State of Kentucky. 579 F.3d at 725. In *Pedreira*, the Sixth Circuit rejected plaintiffs' assertion of *federal* taxpayer standing based upon "general [federal] funding provisions for childcare:"

> These statutes are general funding provisions for childcare; they do not contemplate religious indoctrination. The plaintiffs respond that the statutes do not forbid unconstitutional uses of these funds. A failure to prohibit unconstitutionality, however, does not equate to an unconstitutional congressional funding mandate.

579 F.3d at 731. The Sixth Circuit did find that plaintiffs had *state* taxpayer standing

based upon a finding "that the Kentucky legislature also appropriated sums of money specifically to KBHC." 579 F.3d at 731. The Sixth Circuit found that this "explicit legislative authorization" for "tax-funded aid" to a religious organization evidenced a sufficient nexus between the state legislative actions and the alleged constitutional violations. *Id.* at 732. Thus, *Pedreira* is distinguishable and in fact supports a finding of no taxpayer standing here because the explicit legislative directive absent here was demanded there and was found only in the state legislative enactment that expressly "appropriated sums of money specifically to KBHC."[4]

The teaching of this line of post-*Flast* Supreme Court precedent is that *Flast* is alive and well and that if the legislative enactment at issue does not expressly authorize the religiously-challenged expenditure at issue, the *Flast* test will not be met. Here, Plaintiffs assert that "[f]unds for child placing agencies come largely from appropriations made by the Michigan Legislature for foster care payments and the

---

[4] In *Pedreira*, the Sixth Circuit suggested that the standard for establishing *state* taxpayer standing was different from the *Flast* "nexus" standard and only required a showing of "pocketbook" injury. 579 F.3d at 731. However, as the Sixth Circuit realized in a subsequent decision in *Pedreira*, "in *Winn* the Supreme Court held that state-taxpayer standing requires a plaintiff to establish the same two elements required for federal-taxpayer standing." *Pedreira v. Sunrise Children's Services, Inc.*, 802 F.3d 865, 870 (6th Cir. 2015) (citing *Winn*, 131 S. Ct. at 1445-47). Although the Sixth Circuit saw "no occasion to revisit [its] holding in *Pedreira I*," it did acknowledge that both *Flast* conditions must exist in order for a plaintiff to establish state taxpayer standing. *Id.*

Child Care Fund, which must be spent according to relevant child welfare statutes."

(Pls.' Resp. 12-13.)  In support of this assertion, Plaintiffs refer by way of example to

the "FY2018 Appropriations Act," which Plaintiffs allege "made specific

appropriations for foster care payments and Child Care Fund." (Pls.' Resp. 13 n. 14.)

Plaintiffs assert that "DHHS is empowered to promulgate regulations and oversee

spending under the Child Care Fund." (*Id.*)  Plaintiffs also refer to paragraphs 38-50

and 76-77 of their Complaint.  Absent, however, from any of this supporting evidence

is any indication that the state legislature specifically directed that the funds they were

appropriating to DHHS to carry out its mission with respect to the State's foster care

system be used to further or carry out *any* religious purpose.  Indeed, at the hearing

on the motions to dismiss, counsel for the Plaintiffs conceded that the funding statute

at issue here says nothing about religion. ((ECF No. 48, Transcript of July 12, 2018

Hearing ("Hr'g Tr.") 53:1-10.)  There is no legislative mandate or requirement that

the DHHS contract with any particular child placing agency and there is no express

legislative mandate that funds appropriated be used to support any particular religious

agenda.

Plaintiffs have not identified an express legislative appropriation directing that

funds be used to further or carry out any religious purpose.  Plaintiffs have failed to

establish taxpayer standing.  Accordingly, the Court DISMISSES WITH PREJUDICE

the claims of Plaintiff Jennifer Ludolph against the Defendants. As discussed *supra*, the Prospective Parent Plaintiffs have established general Article III standing at this stage of the proceedings with respect to both their Equal Protection and Establishment Clause claims, and their standing under Article III is unaffected by the Court's ruling on taxpayer standing.

### C. The Prospective Parent Plaintiffs Have Plausibly Alleged an Establishment Clause Claim

The Plaintiffs and the State Defendants appear to agree that in analyzing Plaintiffs' Establishment Clause Claim the Court should apply the familiar test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). Intervenor Defendants argue that the *Lemon* test has been "superseded" by *Town of Greece v. Galloway*, 134 S. Ct. 1811 (2014), in which the Supreme Court interpreted the Establishment Clause with reference to "historical practices and understandings," dating back to the time of adoption of the First Amendment in analyzing the constitutionality of legislative prayer. 134 S. Ct. at 1819. But the Sixth Circuit has expressly rejected such a notion, observing that "*Town of Greece* gives no indication that the Court intended to completely displace the endorsement test. . . . it simply explains why a historical view was more appropriate in the case at hand." *Smith v. Jefferson County Bd. of School Com'rs*, 788 F.3d 580, 589 (6th Cir. 2015).

In *Smith*, "[a] county school board, facing a budget shortfall, abolished its alternative school and contracted for its students to be educated in the secular, alternative-school program at a private, Christian school." *Id*. at 582. The School Board paid the private school a total of $1,702,368 over a seven-year period. *Id*. at 584. Examining the challenged conduct there, the Sixth Circuit cogently explained the emergence of a "three thread" test for determining whether governmental action violates the Establishment Clause:

> To decide whether a governmental action violates the Establishment Clause, we must weave together three main jurisprudential threads. The first thread is the "*Lemon* test," named after the Supreme Court's decision in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). Under that test, the action comports with the Establishment Clause only if it satisfies three distinct prongs. First, the activity must "have a secular legislative purpose." *Id*. at 612, 91 S.Ct. 2105. Second, "its principal or primary effect must be one that neither advances nor inhibits religion." *Id*. Third, it "must not foster 'an excessive government entanglement with religion.'" *Id*. at 613, 91 S.Ct. 2105 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970)).

> The next thread is an "endorsement" analysis, first discussed by Justice O'Connor in *Lynch v. Donnelly*, 465 U.S. 668, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984). As Justice O'Connor intended, *Lynch*, 465 U.S. at 688, 104 S.Ct. 1355 (O'Connor, J., concurring), the Sixth Circuit "has treated the endorsement test as a refinement or clarification of the *Lemon* test." *Granzeier v. Middleton*, 173 F.3d 568, 573 (6th Cir. 1999); *see also, e.g., Satawa v. Macomb Cnty. Rd. Comm'n*, 689 F.3d 506, 526 (6th Cir. 2012) (explaining the Sixth Circuit's application of the *Lemon* test); *Am. Civil Liberties Union v. Grayson Cnty*., 591 F.3d 837, 844–45 (6th Cir. 2010) (using the *Lynch* discussion as guidance in applying the *Lemon* test). Justice O'Connor explained that *Lemon's* first prong, which

focuses on the government's purpose, really asks "whether [the] government's actual purpose is to endorse or disapprove of religion." *Lynch*, 465 U.S. at 690, 104 S.Ct. 1355 (O'Connor, J., concurring). While the first *Lemon* prong is subjective, the second is objective. It asks "whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval." *Id.* If either the purpose or effect of the government activity is to endorse or disapprove of religion, the activity is unconstitutional. *Id.*

Excessive entanglement—*Lemon's* third prong—remains relevant. Under Justice O'Connor's test, such entanglement would still be grounds for striking down the activity, even if there is no hint of endorsement or disapproval. *See id.* at 689, 104 S.Ct. 1355. Since then, however, the Court has "recast *Lemon's* entanglement inquiry [in the public school context] as simply one criterion relevant to determining a statute's effect." *Mitchell v. Helms*, 530 U.S. 793, 808, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (plurality opinion) (citing *Agostini v. Felton*, 521 U.S. 203, 232–33, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997)).

The final jurisprudential thread—most recently seen in *Town of Greece v. Galloway*, —— U.S. ——, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014), but relevant since *Marsh v. Chambers*, 463 U.S. 783, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983)—involves a historical approach. It takes the view that "it is not necessary to define the precise boundary of the Establishment Clause where history shows that the specific practice is permitted. Any test the Court adopts must acknowledge a practice that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S.Ct. at 1819.

788 F.3d at 586-87.

The Sixth Circuit then analyzed these three "threads" as relevant to the Board's

conduct and ultimately found no coercion, endorsement, or entanglement. Rejecting

the suggestion that *Town of Greece* fully displaced the longstanding *Lemon* test, the

Sixth Circuit held that, in cases like the one before it "that cannot be resolved by resorting to historical practices, we do not believe that *Town of Greece* requires us to depart from our pre-existing jurisprudence." *Id*. at 588. "*Town of Greece* gives no indication that the Court intended to completely displace the endorsement test. . . . it simply explains why a historical view was more appropriate in the case at hand." *Id*. at 589. *Smith* does instruct, however, that the Court should at least consider whether historical practice answers the question and, if not, should proceed with its three-pronged approach, which includes an analysis of the *Lemon* factors. "Our inquiry, then, should be threefold. First, does historical practice indicate that the Board's action was constitutionally compliant, regardless of any specific test? Second, did the relationship with Kingswood have the effect of advancing religion—or, in other words, did it objectively convey a message of religious endorsement? Third, did it foster an excessive entanglement of government and religion?" *Smith*, 788 F.3d at 588.

The Intervenor Defendants cite several articles discussing the "historical partnership" between religious organizations and Michigan's adoption and foster care system. (ECF No. 19, Intervenor Defs.' Mot. 6-9, PgID 504-07.) Apart from being matters that the Court cannot consider in its analysis of the facial plausibility of Plaintiffs' Complaint (which contains no allegations about the significance of such an

historical partnership), the materials cited by the Intervenor Defendants do not establish the existence of an historical practice in the area of the State's contractual practices relating to public welfare for wards of the state "that was accepted by the Framers and has withstood the critical scrutiny of time and political change." *Town of Greece*, 134 S. Ct. at 1819. Consequently here, and generally outside the context of legislative prayer, "the pure historical approach is of limited utility." *Smith*, 788 F.3d at 588. *See Bormuth v. County of Jackson*, 870 F.3d 494, 504 (6th Cir. 2017) (observing that *Marsh v. Chambers*, 463 U.S. 783 (1983) "carv[ed] out an exception," as did *Town of Greece* in its footsteps, "to the [Supreme] Court's Establishment Clause jurisprudence" in the context of legislative prayer) (first alteration added). There is no evidence in the Supreme Court's rulings since *Town of Greece* "that the historical approach had become the only relevant, or even dominant, mode of analysis," and this Court declines to displace the *Lemon* test and apply *Town of Greece* here in the context of a motion to dismiss. *Smith*, 788 F.3d at 589.

Before turning to the *Lemon* test and its relevant variants, it is important to bear in mind that we are analyzing Plaintiffs' claims at the motion to dismiss stage, which asks only whether the allegations of the Complaint and all reasonable inferences that flow from those allegations, which we must accept as true for now, plausibly allege a claim. Thus, it is critical to our endeavor to understand what the Plaintiffs have

alleged in their Complaint and what they have not alleged. "Plaintiffs do *not* challenge the eligibility of religious organizations to receive government contracts to provide social services." (ECF No. 37, Pls.' Intervenor Resp. 13, PgID 832.) Rather, Plaintiffs challenge the State's practice of contracting with child placing agencies and authorizing those agencies to use religious eligibility criteria in the public child welfare system. (*Id*.) Specifically, Plaintiffs ask the Court "to invalidate the State's practice of allowing state-contracted, taxpayer-funded child placing agencies to disqualify prospective families headed by same-sex couples based on agencies' religious beliefs." (*Id*.) Plaintiffs do not seek to prevent the State from entering into contracts with faith-based child placing agencies for the provision of child welfare services. Rather, Plaintiffs seek to ensure that the State does so on the same terms that it contracts with secular agencies. (*Id*. at 13-14, PgID 832-33.) The Plaintiffs have sued the State Defendants, arguing that the State's practice of permitting state-contracted child placing agencies that perform a state function to use religious criteria to exclude prospective adoptive and foster parents constitutes endorsement and promotion of religion and is prohibited by the Establishment Clause. (*Id*. at 10, PgID 829.) The Plaintiffs have not sued St. Vincent or any other child placing agency. St. Vincent and the other Intervenor Defendants sought and were granted permission to intervene in this matter only to place their views before the Court. Nor do the

Plaintiffs directly challenge the constitutionality of PA 53, which created the religious belief exemption on which St. Vincent and other faith-based child placing agencies have been permitted to rely in employing religious criteria in their state-contracted work. The Plaintiffs have sued only the State Defendants who are responsible (in their official capacities) for the implementation of PA 53 and who enter into contracts with child placing agencies to perform adoption and foster care services for Michigan wards of State. These State-sponsored multi-million dollar contracts expressly recognize a child placing agency's right under PA 53 to refuse to provide services on the basis of their religious beliefs, as relevant here their sincerely held faith-based objection to same-sex marriage. (*See, e.g.* State Defs.' Mot. Ex. 1, 2016 Agreement Between DHHS and St. Vincent, § 2.9(e).) Plaintiffs argue that the State's contracting practices, which are under challenge here, must comport with the Constitution. "A statute *or practice* must conform to all [applicable constitutional] requirements to survive scrutiny under the Establishment Clause." *Doe v. Porter*, 370 F.3d 558, 562 (6th Cir. 2004) (emphasis and alteration added). With this background in mind, the Court turns to the question of whether the Plaintiffs' Complaint alleges a plausible claim against the State Defendants under the Establishment Clause.

The First Clause of the First Amendment provides that: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise

48

thereof." U.S. Const. amend. I.  The law applies equally to restrict the power of the states through "the application of the First Amendment to the States by the Fourteenth."  *Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 8 (1947). "Government in our democracy, state and national, must be neutral in matters of religious theory, doctrine, and practice.  It may not be hostile to any religion or to the advocacy of nonreligion; and it may not aid, foster, or promote one religion or religious theory against another or even against the militant opposite. The First Amendment mandates governmental neutrality between religion and religion, and between religion and nonreligion."  *Epperson v. State of Ark.*, 393 U.S. 97, 103-04 (1968). "As made applicable to the States through the Fourteenth Amendment, the Clause prohibits government from favoring one religion over another or from favoring religion over irrelegion (or irrelegion over religion)."  *Freedom from Religion Foundation, Inc. v. City of Warren, Mich.*, 707 F.3d 686, 691 (6th Cir. 2013).  This "principle . . . that government should not prefer one religion to another, or religion to irreligion," is "at the heart of the Establishment Clause."  *Bd. of Educ. of Kiryas Joel Village School Dist. v. Grumet*, 512 U.S. 687, 703 (1994).

"The fundamental source of constitutional concern here is that the legislature itself [or the State in practice] may fail to exercise governmental authority in a religiously neutral way."  *Kiryas Joel*, 512 U.S. at 703 (alteration added). The

Establishment Clause dispute in this case focuses on the second and third prongs of the *Lemon* test, as interpreted by the Sixth Circuit in *Smith*. Thus we ask: (1) whether the State's implementation of PA 53 has "the primary effect of advancing religion," i.e. whether "the action convey[s] an objective message that the government [is] endorsing religion," *Smith*, 788 F.3d at 589; and (2) whether the State's implementation of PA 53 "involve[s] an excessive entanglement between church and state." *Id.* at 593.

The "endorsement" prong asks "'whether, irrespective of government's actual purpose, the practice under review in fact conveys a message of endorsement or disapproval.'" *Smith*, 788 F.3d at 587 (quoting *Lynch v. Donnelly*, 465 U.S. 668, 690 (1984) (O'Connor, J., concurring). "If either the purpose or effect of the government activity is to endorse or disapprove of religion, the activity is unconstitutional." *Id.* At this stage of the proceedings we ask only if, accepting as true the allegations of the Plaintiffs' Complaint and all reasonable inferences that flow from those allegations, the Plaintiffs' Complaint plausibly alleges that the State's practice of contracting with faith-based child placing agencies, acknowledging that the agencies may use the religious belief exemption provided in PA 53 to turn away same-sex couples, conveys the message that the State endorses the view that opposes same-sex marriage. The answer is yes.

In paragraphs 38-50 of the Complaint, Plaintiffs plausibly allege and suggest that the State's practice of contracting with and permitting faith-based child placing agencies to turn away same-sex couples has both the subjective purpose of discriminating against those who oppose the view of the faith-based agencies (allegedly demonstrated through the legislative history of PA 53) and objectively endorses the religious view of those agencies that same-sex marriage is wrong, sending a "'message [to Plaintiffs] that they are outsiders, not full members of the community.'" (Pls.' State Resp. 19, PgID 651) (quoting *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290, 309-10 (2000)). While the State Defendants dispute these facts, we must assume for our present procedural purposes that these allegations are true and that in the face of such facts "an objective observer would conclude that [the State's implementation of PA 53 through its contracts with child placing agencies] communicates a message of government endorsement of religion, generally, and of [opposition to same-sex marriage] in particular." *Porter*, 370 F.3d at 563. The State Defendants argue that PA 53 does not favor one religion over another, but the Establishment Clause prohibits the State from "prefer[ing] one religion to another, *or religion to irreligion*." *Kiryas Joel*, 512 U.S. at 703 (alteration and emphasis added). According to the allegations of Plaintiffs' Complaint, the Defendants' implementation of PA 53 favors the views of those opposing same-sex marriage by permitting faith-

based child placing agencies to discriminate on the basis of their deeply held religious beliefs that reject same-sex marriage.

The State Defendants argue that the State's implementation of PA 53 has a secular purpose – seeking to alleviate interference with faith-based agencies' abilities to carry out their religious mission to create the greatest environment for the benefit of the most children. The State Defendants submit that the legislation expressly avoids entanglement by not placing the State Defendants in the position of evaluating the religious or secular merits or demerits of a child placing agency's reason for declining a case referral. (State Defs. Mot. 16-18, PgID 79-81.) Defendants rely on *Corporation of Presiding Bishop of Church of Jesus Christ of Latter Day Saints v. Amos*, 483 U.S. 327 (1987), to support the conclusion that "PA 53 and Defendants' implementation of it have a secular purpose because they seek to "alleviate" interference with faith-based agencies' ability to define and carry out their religious missions." (State Defs.' Mot. 18, PgID 81.) In *Amos*, the Supreme Court held that section 702 of the Civil Rights Act of 1964, which exempts religious organizations from complying with Title VII's prohibition against discrimination on the basis of religion, did not amount to "an unlawful fostering of religion." 483 U.S. at 334-35 (internal quotation marks and citation omitted). The Court noted that it "has long recognized that the government may (and sometimes must) accommodate religious

practices and that it may do so without violating the Establishment Clause." *Id.* at 334. Observing that "[t]here is ample room under the Establishment Clause for "'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference,'" *id.* at 334 (quoting *Walz v. Tax Comm'n*, 397 U.S. 664, 669 (1970)), the Court acknowledged that under *Lemon*, "it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 335. With regard to the second prong of the *Lemon* test, the effect of the law in question, the Court observed: "A law is not unconstitutional simply because it *allows* churches to advance religion, which is their very purpose. For a law to have forbidden "effects" under *Lemon*, it must be fair to say that the government itself has advanced religion through its own activities and influence." *Id.* at 337 (emphasis in original). The authors of the Establishment Clause, the Court recalled, aimed to preclude "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Id.* The Court concluded: "Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption comes packaged with benefits to secular entities." *Id.* at 338.

The State Defendants submit that they are "not seeking to advance religion, but to create a provider environment that allows faith-based *and* non-faith-based CPAs to flourish, for the benefit of children." (State Defs.' Mot. 18, PgID 81) (emphasis in original). While *Amos* certainly stands for the propositions cited, and while the State's claims regarding purpose may be capable of proof at a later stage of the proceedings, they cannot be credited on a motion to dismiss because they directly contradict the allegations of Plaintiffs' Complaint, which alleges that the Legislature in adopting PA 53, and the State Defendants' in implementing PA 53, harbored the impermissible purpose of "authorizing discrimination by those with religious opposition to same-sex couples." (Pls.' State Resp. 19, PgID 651.) For purposes of analyzing Plaintiffs' Establishment Clause claim on this motion to dismiss, the Court must accept the Plaintiffs' allegations of improper purpose as true. Plaintiffs have sufficiently alleged the State's improper "endorsement" of religion.[5] Moreover, Plaintiffs submit that there are important substantive distinctions regarding *Amos*, including the facts that the defendants in *Amos*, the Desert Gymnasium, a nonprofit facility run by the Corporation of the Presiding Bishop of the Church of Jesus Christ

---

[5] The Court notes that *Amos*, like many of the Establishment Clause cases relied upon by the Defendants, came to the Supreme Court on a summary judgment record. As this Court previously observed, in many respects the Defendants' motions are premature.

of Latter-day Saints, and the Corporation, were religious entities associated with the Church. They were not funded by the government, did not enter into contracts with the government to provide governmental services, and were not alleged to have been conducting government functions. The defendants in *Amos* were religious organizations engaged in their own activities seeking exemptions from generally applicable laws so that they could continue carrying on their own work consistent with their religious beliefs. A very different set of facts from those alleged here.

The entanglement prong asks whether the State's implementation of PA 53 "fosters an excessive entanglement between the state and religion," which Plaintiffs argue can occur where as here the State "delegat[es] a governmental function to a religious institution." *Porter*, 370 F.3d at 563-64 (citing *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982)). "The question presented [in *Larkin* was] whether a Massachusetts statute ["§ 16C"], which vests in the governing bodies of churches and schools the power effectively to veto applications for liquor licenses within a five hundred foot radius of the church or school, violates the Establishment Clause of the First Amendment or the Due Process Clause of the Fourteenth Amendment." 459 U.S. at 117. Section 16C provided that: "Premises . . . located within a radius of five hundred feet of a church or school shall not be licensed for the sale of alcoholic beverages if the governing body of such church or school files written objection

thereto." *Id*. The appellee applied for a liquor license and was denied a license on the sole basis of the objection of a church that was within 10 feet of the proposed location. *Id*. at 118. The Supreme Court acknowledged the three relevant *Lemon* criteria and observed: "Independent of the first of those criteria, the statute, by delegating a governmental power to religious institutions, inescapably implicates the Establishment Clause." *Id*. at 123. The Court acknowledged the "valid secular legislative purpose[]" to "protect[] spiritual, cultural, and educational centers from the 'hurly-burly' associated with liquor outlets," *id*. at 123, but reasoned that purpose could be accomplished through other means. *Id*. at 124. The Court focused, however, on the second *Lemon* prong, finding that because a church's "power under the statute is standardless, calling for no reasons, findings, or reasoned conclusions[,] [t]hat power may therefore be used by churches to promote goals beyond insulating the church from undesirable neighbors [and] it could be employed for explicitly religious goals . . . ." *Id*. at 125. Absent "effective means of guaranteeing that the delegated power will be used exclusively for secular, neutral, and nonideological purposes," the Court found there was potential for advancing the church's religious purposes. *Id*. at 125-26 (internal quotation marks and citations omitted). Turning to the third *Lemon* prong, the Court observed:

Turning to the third phase of the inquiry called for by *Lemon v. Kurtzman, supra*, we see that we have not previously had occasion to consider the entanglement implications of a statute vesting significant governmental authority in churches. This statute enmeshes churches in the exercise of substantial governmental powers contrary to our consistent interpretation of the Establishment Clause; "[t]he objective is to prevent, as far as possible, the intrusion of either [Church or State] into the precincts of the other."

459 U.S. at 126 (quoting *Lemon*, 403 U.S. at 614) (alterations in original). The Court found that the "fusion of governmental and religious functions" inherent in the delegation violated the Establishment Clause: "The Framers did not set up a system of government in which important, discretionary governmental powers would be delegated to or shared with religious institutions." *Id.* at 127.

Again in *Kiryas Joel*, *supra*, the Supreme Court revisited this issue of the "'fusion of governmental and religious functions" brought about by legislation that "delegat[es] 'important, discretionary governmental powers' to religious bodies, thus impermissibly entangling government and religion." 512 U.S. at 696-97 (quoting *Larkin*, 459 U.S. at 126). *Kiryas Joel* involved a New York statute that carved out a distinct school district for a village ("Kiryas Joel") of "vigorously religious people" that isolated its members from the larger community, often to the detriment of the "handicapped children" of Kiryas Joel who were unable to benefit from the publicly-funded schools outside the village that offered special education services. *Id.* at 691-

94.  In "a good faith effort to solve th[e] unique problem associated with providing special education services to handicapped children in the village," New York enacted a statute that created a separate school district for Kiryas Joel and "empowered a locally elected board of education to take such action as opening schools and closing them, hiring teachers, prescribing textbooks, establishing disciplinary rules, and raising property taxes to fund operations." *Id*. at 693.  Before the new district began to operate, plaintiffs filed suit challenging the statute as an unconstitutional establishment of religion. *Id*. at 694. The New York State Court of Appeals concluded that the "statute's primary effect was an impermissible advancement of religious belief," that the effect was "purposeful," and that the statute therefore violated the first and second *Lemon* prongs. *Id*. at 695.  The dissenting State Court of Appeals judge disagreed, opining that "the new district was created to enable the village's handicapped children to receive a secular, public-school education; that this was, indeed, its primary effect; and that any attenuated benefit to religion was a reasonable accommodation of both religious and cultural differences." *Id*. at 695-96.  Relying on *Larkin's* "teach[ing] that a State may not delegate its civic authority to a group chosen according to a religious criterion," *id*. at 695, the Supreme Court found the statute unconstitutional:

[W]e are clearly constrained to conclude that the statute before us fails the test of neutrality. It delegates a power this Court has said ranks at the very apex of the function of a State, to an electorate defined by common religious belief and practice, in a manner that fails to foreclose religious favoritism. It therefore crosses the line from permissible accommodation to impermissible establishment.

512 U.S. at 709-10 (internal quotation marks and citation omitted). In reaching its conclusion, the Supreme Court took great care to explain:

In finding that Chapter 748 violates the requirement of governmental neutrality by extending the benefit of a special franchise, we do not deny that the Constitution allows the State to accommodate religious needs by alleviating special burdens. Our cases leave no doubt that in commanding neutrality the Religion Clauses do not require the government to be oblivious to impositions that legitimate exercises of state power may place on religious belief and practice. Rather, there is "ample room under the Establishment Clause for 'benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference," *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U.S. 327, 334, 107 S.Ct. 2862, 2867–2868, 97 L.Ed.2d 273 (1987) (quoting *Walz v. Tax Comm'n*, supra, 397 U.S., at 673, 90 S.Ct., at 1413); "government may (and sometimes must) accommodate religious practices and ... may do so without violating the Establishment Clause." *Hobbie v. Unemployment Appeals Comm'n of Fla.*, 480 U.S. 136, 144–145, 107 S.Ct. 1046, 1051, 94 L.Ed.2d 190 (1987). The fact that Chapter 748 facilitates the practice of religion is not what renders it an unconstitutional establishment. *Cf. Lee v. Weisman*, 505 U.S. 577, 627, 112 S.Ct. 2649, 2676, 120 L.Ed.2d 467 (1992) (SOUTER, J., concurring) ("That government must remain neutral in matters of religion does not foreclose it from ever taking religion into account"); *School Dist. of Abington Township v. Schempp*, 374 U.S., at 299, 83 S.Ct., at 1612 (Brennan, J., concurring) ("[H]ostility, not neutrality, would characterize the refusal to provide chaplains and places of worship for prisoners and soldiers cut off by the State from all civilian opportunities for public communion").

But accommodation is not a principle without limits, and what petitioners seek is an adjustment to the Satmars' religiously grounded preferences that our cases do not countenance. Prior decisions have allowed religious communities and institutions to pursue their own interests free from governmental interference, *see Corporation of Presiding Bishop v. Amos, supra*, 483 U.S., at 336–337, 107 S.Ct., at 2868–2869 (government may allow religious organizations to favor their own adherents in hiring, even for secular employment); *Zorach v. Clauson*, 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (government may allow public schools to release students during the schoolday to receive off-site religious education), but we have never hinted that an otherwise unconstitutional delegation of political power to a religious group could be saved as a religious accommodation. Petitioners' proposed accommodation singles out a particular religious sect for special treatment, and whatever the limits of permissible legislative accommodations may be, compare *Texas Monthly, Inc. v. Bullock*, supra (striking down law exempting only religious publications from taxation), with *Corporation of Presiding Bishop v. Amos, supra* (upholding law exempting religious employers from Title VII), it is clear that neutrality as among religions must be honored. *See Larson v. Valente, supra*, 456 U.S., at 244–246, 102 S.Ct., at 1683.

512 U.S. at 705-07.

Plaintiffs do not dispute that the government "'may (and sometimes must) accommodate religious practices,'" and has often done so within the bounds of the Establishment Clause. *Amos*, *supra*, 483 U.S. at 334 (1987) (quoting *Hobbie v. Unemployment Appeals Comm'n of Fla*., 480 U.S. 136 (1987)). But as the Supreme Court did in *Kiryas*, the Plaintiffs distinguish the cases relied upon by Defendants, including *Amos*, because those cases involved exemptions granted to religious institutions "to pursue their own interests free from governmental interference," not

to carry out the duties of government according their own religious beliefs. *Kiryas Joel*, 512 U.S. at 706.

Plaintiffs here argue that the State Defendants' delegation of public child welfare services to faith-based child placing agencies "with permission to use religious eligibility criteria violates the Establishment Clause." (Pls.' Resp. to State Defs.' Mot. 16, PgID 648.) Defendants are correct, and in fact Plaintiffs concede, that the Establishment Clause does not prohibit the government from entering into contracts with religious organizations empowering them to provide social services. (ECF No. 37, Pls.' Resp. to Intervenor Defs.' Mot. 13, PgID 832.) But, as Plaintiffs clarify, they do not "challenge the eligibility of religious organizations to receive government contracts to provide social services; rather, Plaintiffs challenge the use of religious eligibility criteria in the public child welfare system." (*Id.*) It is true that an individual cannot be denied the right hold public office because of his religious beliefs, and a religious organization cannot be precluded from participating in the provision of government services solely because of its religious beliefs. But, in the case of an individual or an institution, the reverse is not true:

> It is true that religious people (or groups of religious people) cannot be denied the opportunity to exercise the rights of citizens simply because of their religious affiliations or commitments, for such a disability would violate the right to religious free exercise, *see McDaniel v. Paty*, 435 U.S. 618, 98 S.Ct. 1322, 55 L.Ed.2d 593 (1978), which the First

Amendment guarantees as certainly as it bars any establishment. But *McDaniel*, which held that a religious individual could not, because of his religious activities, be denied the right to hold political office, is not in point here. That individuals who happen to be religious may hold public office does not mean that a State may deliberately delegate discretionary power to an individual, institution, or community on the ground of religious identity. If New York were to delegate civic authority to "the Grand Rebbe," *Larkin* would obviously require invalidation (even though under *McDaniel* the Grand Rebbe may run for, and serve on, his local school board), and the same is true if New York delegates political authority by reference to religious belief. Where "fusion" is an issue, the difference lies in the distinction between a government's purposeful delegation on the basis of religion and a delegation on principles neutral to religion, to individuals whose religious identities are incidental to their receipt of civic authority.

*Kiryas*, 512 U.S. at 698-99.

Intervenor Defendants distinguish *Larkin* and *Kiryas Joel* by reiterating their argument that Plaintiffs have failed to allege state action and each of those cases involved a state actor. (Intervenor Defs.' Reply at 11, n. 9.) The Court rejects the Defendants' state action argument as discussed at length *infra* in Section III(E). The State Defendants do not otherwise substantively address *Larkin* and *Kiryas Joel* at all in their Reply. Plaintiffs argue that the State Defendants have delegated a public function to religious entities and are permitting (if not authorizing through the contractual acknowledgment of the PA 53 exemption in the child placing agency contracts) those entities to employ religious criteria in carrying out that public function, in violation of the Establishment Clause. At oral argument, Counsel for the

State Defendants distinguished *Larkin* as having created a "limited exception" for the situation in which the government delegates an *exclusive* government function. But what *Larkin* actually said, without limitation, was that "delegating a governmental power to religious institutions inescapably implicates the Establishment Clause." 459 U.S. at 123. The Plaintiffs allege that "[b]y statute, the State is responsible for the care of the children who are in Michigan's foster care system," and that the State has "delegated its statutory child-welfare responsibilities to private agencies." (Compl. ¶ 4.) There is nothing before this Court on these motions to dismiss to support the State Defendants' counsel's statements at the hearing that adoption and foster care services are not sufficiently "exclusive" governmental functions – in fact we know very little about how these child placing agencies actually operate in carrying out their contractual duties or the actual scope of those duties in practice. The Plaintiffs allege that the State Defendants could not turn away a same-sex couple on the basis of religious objections yet they acknowledge that they are permitting their delegated agencies, carrying out a State function, to do exactly what the Constitution forbids them to do. (Compl. ¶ 9.) The State Defendants submit that their actions are constitutionally permissible because they are merely attempting to "remain neutral" by allowing the faith-based agencies to carry out their contractual duties based upon their religious beliefs. The State Defendants submit that this practice is supported by

the secular need to provide the greatest availability of families for the State's wards. But these submissions directly contradict the allegations of Plaintiffs' Complaint which claim otherwise. The child placing agencies are, in many ways, the gateway for a family seeking to adopt or foster a child into Michigan's adoption and foster care system. The scope of their duties, and hence any "government exclusivity" of the functions they perform, must be the subject of further discovery. For purposes of analyzing Plaintiffs' Establishment Clause claim, the Court must accept the allegations of the Complaint as true and such allegations surely "implicate" the Establishment Clause and plausibly suggest "excessive entanglement" such that the Court will allow Plaintiffs' Establishment Clause claim to proceed further.[6]

---

[6] The Defendants argue strenuously that the Court should rely on an unpublished 2012 opinion from another court in this District, *Brent v. Wayne County Dept of Human Servs.*, No. 11-10724, 2012 WL 12877988 (E.D. Mich. Nov. 15, 2012), to conclude that St. Vincent and the other child placing agencies are not state actors and that foster and adoption services for the wards of the State are not the exclusive function of the State. In *Brent*, Judge Julian Abele Cook was considering the very different issue, not before this Court, of whether the private entity defendants sued there, which provided contractual services for the State, could be considered state actors for purposes of liability under § 1983. Plaintiffs here have not sued any private child placing agencies. But more importantly, the Sixth Circuit recently reversed this aspect of Judge Cook's November 15, 2012 Opinion and Order in *Brent v. Wayne County Department of Human Services*, __F.3d__, 2018 WL 4016607, at *7-8 (6th Cir. Aug. 23, 2018) (concluding that "plaintiffs have alleged enough facts to plausibly state that Methodist and the Children's Center are state actors"). Defendants were eager to compare themselves to the "foster care agencies" deemed not state actors by the district court in *Brent*, (*see, e.g.* Intervenor Defs.' Mot. 11-12, PgID 508-09), and will now have to contend with the Sixth Circuit's published decision in *Brent*.

**D.     The Prospective Parent Plaintiffs Have Plausibly Alleged an Equal Protection Claim**

> "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1, cl. 4.

"The Equal Protection Clause of the Fourteenth Amendment . . . is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne, Texas v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  "[T]he courts have themselves devised standards for determining the validity of state legislation or other official action that is challenged as denying equal protection."  *Id*. at 439-40. The Sixth Circuit has not recognized sexual orientation as a suspect classification and thus Plaintiffs' Equal Protection claim "is governed by rational basis review."  *Davis v. Prison Health Servs.*, 679 F.3d 433, 438 (6th Cir. 2012).

Plaintiffs allege in their Complaint that PA 53, and the State Defendants' implementation of PA 53, is animated by disapproval of, or opposition to, same-sex marriage.  The Defendants argue that the secular purpose of PA 53, which is stated in the text of PA 53, is that "[h]aving as many possible qualified adoption and foster parent agencies in this state is a substantial benefit to the children of this state who are in need of these placement services. . . ."  (Mich. Comp. Laws § 722.124e, Sec. 14e(1)(c).)  The State Defendants submit that "the State's interest is to find as many

65

families as possible for children," and "to achieve the policy of casting the net as wide as it can, the State has chosen to continue its long-time and historical practice of contracting with faith-based and as well as secular child placement agencies. . . . [a]nd the legislature has recognized that keeping the CPA network broad and diverse results in the recruitment of more families which benefits all children in the State's care." (Hr'g Tr. 10:6-7, 10-13, 16-19.) The State Defendants submit that this stated purpose, which is set forth in the enacted legislation itself, is judicially noticeable on a motion to dismiss. The Plaintiffs' Complaint directly contradicts the rationality of this alleged secular purpose, and alleges that allowing faith-based agencies to turn away same-sex couples actually "exacerbates the shortage" of qualified families who are available to adopt or foster and "means that some children may be denied the family that is best matched to meet their individual needs." (Compl. ¶¶ 55-56.)

As stated *supra* in the Court's discussion of Plaintiffs' Establishment Clause claim, at this motion to dismiss stage the Court must accept the allegations of Plaintiffs' Complaint, and all reasonable inferences that flow from those factual allegations, as true and cannot credit the contradicting evidence or statements proffered by the Defendants at this point. Defendants argue, however, that in the case of rational basis review, the Court cannot question the State's claimed purpose and therefore cannot credit the allegations of the Complaint for purposes of the Equal

66

Protection analysis. Defendants are correct that this Court's review on a rational basis challenge is highly deferential. They are incorrect, however, in suggesting that the Legislative purpose is unassailable on rational basis review.

"[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319 (1993). "[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id.* (quoting *FCC v. Beach*, 508 U.S. 307, 313 (1993)). "[A] classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 320 (internal quotation marks and citation omitted). "A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. [A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." *Id.* (internal quotation marks and citation omitted). "[T]he burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it." *Id.* (internal quotation marks and citation omitted). And in this last statement, Supreme Court jurisprudence establishes that a stated legislative purpose is not unassailable. Admittedly, the challenger's burden remains high: "Although parties challenging legislation under the

Equal Protection Clause may introduce evidence supporting their claim that it is irrational, 'they cannot prevail so long as it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'" *Minnesota v. Clover Leaf Creamery Co*., 449 U.S. 456, 464 (1981) (quoting *United States v. Carolene Products Co*., 304 U.S. 144, 153-54 (1938)) (alteration in original). "Where there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Clover Leaf*, 449 U.S. at 464. The Sixth Circuit has stated the following rational basis test:

> The Equal Protection Clause of the Fourteenth Amendment "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan Cnty. Bd. of Educ*., 470 F.3d 250, 260 (6th Cir. 2006). Because this court has not recognized sexual orientation as a suspect classification, Davis's claim is governed by rational basis review. *Id*. at 261. Under this test, a "'plaintiff may demonstrate that the government action lacks a rational basis . . . either by negativing every conceivable basis which might support the government action, or by demonstrating that the challenged government action was motivated by animus or ill-will.'" *Id*. (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)). We have previously held that "the desire to effectuate one's animus against homosexuals can never be a legitimate governmental purpose, [and] a state action based on that animus alone violates the Equal Protection Clause." *Stemler v. City of Florence*, 126 F.3d 856, 873–74 (6th Cir. 1997).

*Davis*, 679 F.3d at 438. In *Davis*, the Sixth Circuit held that plaintiff had "alleged facts that, taken as true, state a plausible claim that the defendants" acted because of an anti-gay animus and concluded that plaintiff "deserves a shot at additional factual development, which is what discovery is designed to give him." *Id*. at 438, 440. Here, Plaintiffs assert that PA 53 was passed as a direct effort to oppose same-sex couples and to appease the anti-same-sex objections of certain legislators. (Compl. ¶¶ 38-46.) Plaintiffs argue that the stated Legislative purpose for PA 53 contained in the statute, i.e. to increase the likelihood that greater permanent placements could be achieved through allowing faith-based agencies to turn away same-sex couples, is completely irrational and that in fact the loss of potentially qualified same-sex couples exacerbates that shortage. And in fact, according to Defendants, the Legislature operated under the assumption that the faith-based agencies would shutter operations if they were not granted the religious belief exemption and that this would result in a devastating shortage of agencies to do the State's work and harm to the State's wards. Plaintiffs submit, however, that there is good reason to question the base rationality of those assumptions. *See, e.g., Fulton v. City of Philadelphia*, __F. Supp. 3d__, 2018 WL 3416393, at *6-7 (E.D. Pa. July 13, 2018) (finding that closure of Catholic Social Services "had little or no effect on the operation of Philadelphia's foster care system"), injunction pending appeal denied by *Fulton v. City of Philadelphia, Pa.,*

__S.Ct.__, 2018 WL 4139298 (Mem) (Aug. 30 2018). Plaintiffs submit that "there is no basis in reality" for the speculation that the closing of a faith-based agency will reduce the number of families available for Michigan's children. (Pls.' Intervenor Resp. 17, PgID 836.) "[E]ven the standard of rationality . . . must find some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 321. Although their burden is admittedly high, Plaintiffs are entitled to an opportunity to conduct discovery to support their claim that the State's practice of continuing to contract with faith-based agencies that invoke PA53's religious belief protection to turn away same-sex couples lacks a rational basis and to further develop their Equal Protection claim.

### E. The Prospective Parent Plaintiffs Have Adequately Alleged State Action

As a general overarching point, Defendants argue that Plaintiffs have failed to adequately allege state action, a necessary element of their constitutional claims in this action. For example, Intervenor Defendants point out that every case on which Plaintiffs rely in support of their request for standing based on stigmatic harm involves the actual affirmative conduct of a state actor. (ECF No. 41, Intervenor Defs.' Reply 8-9, PgID 866-67). Here, according to the Defendants' characterization of the Plaintiffs' Complaint, the stigmatic harm allegedly flows from the private child

placing agencies refusal to screen same-sex couples and referring them instead to other non-faith-based child placing agencies. According to the Intervenor Defendants, Plaintiffs have cited no case of "stigmatic harm" that involves a state actor passively "allowing" a private party with whom it has a contract to refuse to work with an individual or entity based on religious objections. Rather, Intervenor Defendants assert, in each case relied upon by Plaintiffs in support of their claim of stigmatic harm the plaintiff alleges that the actions of a government actor, not a private party, caused the stigma. For example, the Intervenor Defendants argue, *Heckler v. Matthews*, 465 U.S. 728 (1984) involved a challenge to statutory pension offsets that required the reduction of social security spousal benefits by amounts of certain federal or state government pensions received by the social security applicant. *Id.* at 732. *Parsons*, *supra*, involved the actions of law enforcement officers and the stigmatizing effects of a report issued by the DOJ. 801 F.3d at 705-06. *Obergefell v. Hodges*, 135 S. Ct. 2584 (2015) involved challenges to state constitutional provisions defining marriage as a union between one man and one woman and the claims were filed against the state officials responsible for enforcing those laws. 135 S. Ct. at 2593. *Moss, supra*, was a suit under section 1983 challenging the actions of a public school district that allowed students to receive academic credits for off-campus religious instruction offered by private educators. 683 F.3d at 601. And finally, Intervenor

Defendants argue, *Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012), was an action by a black Muslim against state election officials seeking to preclude their enforcement of a proposed amendment to the Oklahoma Constitution. (Intervenor Defs.' Reply 9, n. 7, PgID 867.) The Intervenor Defendants point out that "Plaintiffs concede" that their Complaint does not allege that St. Vincent or other child placing agencies are state actors. (*Id.* at PgID 861.)

Similarly, the State Defendants assert that "Plaintiffs are challenging the decisions of private CPAs, not the State." (State Defs.' Mot. 20, PgID 83.) The State Defendants then argue that the Plaintiffs must satisfy the test for establishing that child placing agencies are "state actors" for purposes of the conduct complained of in Plaintiffs' Complaint. The State Defendants argue that Plaintiffs cannot satisfy the public function test, the state compulsion test, or the symbiotic relationship test that govern this issue. (*Id.*) In their Reply, the State Defendants insist that because the child placing agencies "are not state actors, Plaintiffs' claims fail as a matter of law." (ECF No. 30, State Defs.' Reply 4, PgID 670.)

As discussed *supra* at note 6, the Defendants' assertions regarding the private party status of the child placing agencies is at a minimum undermined, if not foreclosed, by the Sixth Circuit's recent decision in *Brent*. But even apart from *Brent*, the Plaintiffs in this case have not sued any child placing agencies. Defendants

stubbornly, and inappropriately, insist on rewriting the Plaintiffs' Complaint. Defendants' argument ignores the fact that these Plaintiffs did not file their claims against St. Vincent or any other child placing agency. They filed their claims against two state officials acting in their official capacities. Plaintiffs allege that "the State caused [their] injuries by authorizing and failing to prevent the agencies' discrimination in the performance of State contracts." (ECF No. 28, Pls.' State Resp. 2, PgID 634.) Plaintiffs also allege that their injuries "were caused by the State Defendants' practice of permitting state-contracted, taxpayer-funded child placing agencies to use religious criteria to turn away prospective foster and adoptive parents." (ECF No. 37, Pls.' Resp. to Intervenor Defs.' Mot. 7, PgID 826.)

In support of their state action argument, Defendants rely primarily on *Blum v. Yaretsky*, 457 U.S. 991 (1982), in which the Supreme Court discussed the circumstances under which the actions of a private party can be attributed to the State.[7] In *Blum*, the plaintiffs, a group of Medicaid patients residing in various private nursing homes, challenged medically-based decisions made by the nursing homes in

---

[7] Before addressing the issue of state action, which the Supreme Court found lacking, the Court in *Blum* addressed the issue of standing, finding that the nursing home residents facing an imminent transfer to a lower level care facility, and a diminution therefore of benefits, had standing to sue the State agencies. As *Blum* makes clear, Defendants' "state action" argument is more appropriately addressed as a merits argument rather than a standing argument. In either case, the result is the same and state action has been sufficiently alleged here.

which they resided to transfer patients without notice and an opportunity to be heard. 457 U.S. at 993. These nursing homes were directly reimbursed by the State, with funds received through the Medicaid program, for the care provided to their residents. *Id*. at 994. Transfer decisions were made by utilization review committees ("URCs") established by each nursing home. *Id*. If a URC determines that a transfer is necessary, either for more or less intensive care, "it must notify the state agency responsible for administering the State's Medicaid assistance." *Id*. at 995. The plaintiffs in *Blum* challenged decisions made by their institutions, without notice to them and an opportunity to be heard, to transfer them to facilities providing a lower level of care. Following administrative hearings, "state social service officials affirmed the decision to discontinue benefits unless respondents accepted a transfer to an HRF providing a reduced level of care." *Id*. Plaintiffs filed suit against the Commissioners of the New York Department of Social Services and the Department of Health, arguing that the transfers violated the Due Process Clause of the Fourteenth Amendment. *Id*. at 996. The district court certified a class, issued a preliminary injunction restraining the defendants from reducing or terminating Medicaid benefits without notice and the right to an evidentiary hearing, and ultimately established guidelines for the substantive issues required to be addressed in any such evidentiary hearing. *Id*. at 997-98. The Second Circuit affirmed and the United States Supreme

Court "granted certiorari to consider the Court of Appeals' conclusions about the nature of state action." *Id*. at 998.

The Supreme Court reversed, holding that although the complaint named state actors, the "gravamen of the plaintiff's complaint" challenged the private medical decisions of physicians and physician committees, not any state regulations or procedures:

> [R]espondents are not challenging particular state regulations or procedures, and their arguments concede that the decision to discharge or transfer a patient originates not with state officials, but with nursing homes that are privately owned and operated. Their lawsuit, therefore, seeks to hold state officials liable for the actions of private parties, and the injunctive relief they have obtained requires the State to adopt regulations that will prohibit the private conduct of which they complain.

457 U.S. at 1003.

Here Plaintiffs are challenging a specific state procedure – the State's procedure of contracting with faith-based child placing agencies that discriminate on the basis of sexual orientation. The "gravamen" of Plaintiffs' Complaint is not the purely private decisions of the faith-based agencies in turning them away. Rather Plaintiffs challenge the actions of Defendant state officials in entering into contracts for the provision of state-contracted services, expressly acknowledging and accepting that certain faith-based agencies may elect to discriminate on the basis of sexual orientation in carrying out those state-contracted services, conduct that the Defendants

75

concede the State could not take itself. ("If the government had said . . . we will refer you elsewhere because of your sexual orientation, I would not be standing up here today, Your Honor, arguing that there's no stigma. That would be an entirely different case.") (Hr'g Tr. 100:18-23). In view of the Sixth Circuit's recent decision in *Brent*, *supra*, there is at least a question whether the faith-based agencies could make this same distinction today. But even apart from *Brent*, the cases that Defendants have relied upon in arguing the absence of state action here do not persuade the Court.

*Blum* is not controlling here. As the Sixth Circuit clearly stated in *Paige v. Coyner*, 614 F.3d 273, 279-80 (6th Cir. 2010), *Blum* has been applied in this Circuit only in the context of a § 1983 action against a private party and "*Blum's* tests are limited to suits where the private party is the one allegedly responsible for taking the constitutionally impermissible action." *Id*. at 280. Under *Blum* the relevant question is whether the state "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Blum*, 457 U.S. at 1004. "Because the state actors in *Blum* took *no* action themselves, the Supreme Court necessarily had to determine whether the state should be obligated to shoulder the blame for solely private action." *Coyner*, 614 F.3d at 280 (emphasis in original). Here, the Plaintiffs' allegations suggest that without the State Defendants' practice of entering into contracts that permit the faith-based

agencies to decline to work with same-sex couples, the faith-based agencies would be unable to turn away same sex couples. "[The State Defendants] could thus be liable not because [the decision to turn away a same sex couple] itself was state action, but because a jury might find that the [decision to turn away a same sex couple] was a reasonably foreseeable consequence of the action taken by [the State Defendants]." 614 F.3d at 280. Indeed, according to Intervenor Defendants, the State's practice of permitting the faith-based agencies to exercise their faith-based religious exemption is the sole factor enabling them to turn away same-sex couples – and without the State's practice, they claim, they will be forced to close. As much as Defendants wish to characterize the Plaintiffs' Complaint as one seeking to hold purely private parties liable as state actors, that is not the "gravamen" of the Complaint that has been pled.

Defendants also urge the Court to consider the persuasive value of *Lown v. Salvation Army, Inc*, 393 F. Supp. 2d 223 (S.D.N.Y. 2005), in which the court relied on *Blum* to determine that the City of New York and certain state officials were not responsible for the Salvation Army's (a private entity receiving significant public funding) allegedly discriminatory employment practices. In reaching this conclusion, the court in *Lown* also relied on another case that Defendants urge this Court to consider, *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982). But both *Lown* and *Rendell-Baker* involved private party defendants who received substantial public funding and

the decisions in both cases finding no state action turned on the absence of any allegation or evidence of the state's influence or involvement in the decisions of those private parties.  In trying to align themselves with cases of this persuasion, the State Defendants assert that the Court must appreciate that the process of placing a child through the State adoption system involves a "two-step" process, and that the alleged discriminatory conduct at issue in this case occurs in the first of those two steps, in which the State claims it has no involvement:

> State Defs.' Counsel: Right. Just to explain the referral process.  The State does not go forward with any adoption or foster care service until it accepts a referral of a particular child from the State.  Once it accepts that referral, the agency is absolutely bound by that nondiscrimination provision that you just read including the prohibition against discrimination based on sexual orientation.
>
> *                    *                    *
>
> State Defs.' Counsel: It's two separate processes.  You've got the recruitment process where the CPA tries to develop a pool of families that would be suitable foster care or adoption providers and that is something the CPA does on its own.
>
> The Court: On its own, but can the CPA, in building up their roster, say the roster is only going to include people that adhere to our religious beliefs?
>
> State Defs.' Counsel: Yes, they can.  Because where the State gets involved is only when that child referral is made.  And if the agency doesn't have a child – or I'm sorry, a family to immediately place the child, they can decline it.  And if they do, then they can accept it but they have a family they already know they're working with.  It's at that point

that the money starts to flow and you have this closer relationship between the State and the CPA but it's separated by the contractual process and PA 53 itself. . . . Under clear Supreme Court precedent, what the CPA does without the State commanding it to do is not state action that can be attributable to these state defendants.

(7/18/18 Hr'g Tr. 19:2-8, 19:14-20:4, 20:13-16.) The "clear Supreme Court precedent" to which counsel referred and went on to discuss was *Blum* and *Rendell-Baker*.

The State Defendants' state action argument must fail, at least at this stage of the proceedings, because: (1) it ignores the language of both *Blum* and *Rendell-Baker* suggesting that the test is not whether the state "commanded" the action but whether the state "overtly or covertly encouraged" or "influenced" the challenged conduct; (2) it ignores the allegations of Plaintiffs' Complaint that plausibly suggest that a singular, unified contract governs the relationship between the State and a child placing agency and that contract does not clearly set forth such a bright-line distinction between funding for the recruitment and referral processes; and (3) it relies on factual assertions that impermissibly (at this stage of the proceedings) contradict the allegations of Plaintiff's Complaint.

The issue is not simply whether the State "commanded" the conduct challenged here – the inquiry is much more nuanced than that. And although there is a statutory provision, Mich. Comp. Laws § 722.124e(1)(h), that provides that a child placing

agency does not receive public funding with respect to a particular child unless the agency accepts the referral, the parties have pointed to nothing in the adoption services contracts that expressly governs how the child placing agency must allocate each dollar of those funds.  The State Defendants suggest that an impenetrable line is drawn between "recruitment" and "referral" and that no funds flow from the State to any aspect of the "recruitment" process where the alleged discriminatory conduct occurs.  This argument contradicts the allegations of Plaintiffs' Complaint, which alleges that the State pays these child placing agencies to perform the entirety of a single contract for public adoption and foster care services, a contract that addresses recruitment as well as referral, and in fact alleges that Plaintiffs do not challenge any agency's use of non-public funds.  (Compl. ¶¶ 3, 8, 25, 32.)  Plaintiffs' counsel described succinctly during oral argument the issues of fact that abound in this inquiry:

> The Court: Let me ask you a question.  Do you dispute the issue of exactly when the funds flow –
>
> Plaintiffs' Counsel: Yeah, I do.
>
> The Court:  – and how is this a question of fact or is this –
>
> Plaintiffs' Counsel: Well, there are some questions of fact in there that certainly that representation cannot be accepted on a motion to dismiss. But also stepping back, they are attempting to parse out the home studying part of their contracted services . . . and say that's not really this

delegated government function, that's not really the funded activity, because the payment arrangement they have . . . with the State is they get paid by per diem rates for the children that they actually place. But the contract themselves specifically call for recruitment and licensing of families and, in fact, we allege in the complaint in paragraphs 25 and 32 that recruitment is a part of that work that they're contracted to do. You can't get funding by placing kids if you don't have families to place them with. And you can't have families to place them with if you don't do the licensing process which necessarily includes a home study. Home studying is not some thing they do for fun on the side that's unrelated to the contract. . . They get to do that because they are contracted by the State to perform adoption and foster care services, so . . . They are getting paid for providing child welfare services for the whole package of what they're providing, and the manner in which the State and the agencies have agreed to provide that payment was based in part on a per diem rate for children in their care. It's simply a matter of payment. It's not that it's different services. It's all part and parcel to the same services.

(Hr'g Tr. 84:12-21, 84:23-25, 85:2-13, 85:21-86:3.)

It is undisputed that the State contracts with the child placing agencies cover the whole range of adoption and foster care services, including recruitment and referral, and that the contracts expressly reference and incorporate the religious belief protection of PA 53, which suggests the State's imprimatur on the use of religious criteria in the very gateway to the State's adoption process. The Intervenor Defendants argued strenuously at the hearing on their motion to dismiss that the Court must look to where the money is actually being spent to determine whether a particular activity is being supported by state funding. (Hr'g Tr. 70:7-72:1.) Discovery is necessary to

determine how the recruitment and referral process actually works and how the funds actually flow, as well as the legal relevance of that flow of funds on the facts that are revealed. The Court cannot accept the State's controverting assertions regarding this alleged "bifurcation" of the recruitment and referral processes at this pleading stage. Nor does the Court express any opinion on the legal significance of such a separation, even assuming it exists here.

Plaintiffs have adequately alleged state action, whether viewed as an issue of standing or as an element of their substantive constitutional claims.

## F. The Court Rejects St. Vincent's First Amendment Arguments Which Rely on Contested Matters Outside the Pleadings and are Prematurely Asserted

St. Vincent argues that any Order from this Court that would preclude the State from allowing faith-based child placing agencies to use religious criteria in carrying out adoption and foster care services under their contracts with the State would violate St. Vincent's constitutional rights under the Free Exercise and Free Speech Clauses of the First Amendment. (Intervenor Defs.' Mot. 14-24.) As Plaintiffs correctly observe, none of these affirmative defenses are relevant to the only issue before the Court – whether Plaintiffs have adequately pleaded cognizable Establishment Clause and Equal Protection claims. Even looking forward at this pleading stage to the potential effects of this Court's granting Plaintiffs the relief they seek, the Court is

unconvinced that St. Vincent can prevail on a claim that prohibiting the State from allowing the use of religious criteria by those private agencies hired to do the State's work would violate St. Vincent's Free Exercise or Free Speech rights.

St. Vincent relies primarily on four cases, none of which compels the Court to reach the conclusions they urge. In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the Supreme Court found "an impermissible attempt to target petitioners and their religious practice" in ordinances that prohibited the killing of animals for sacrificial/ritual purposes. 508 U.S. at 535. The Court found that "almost the only conduct subject to [the] Ordinances . . . is the religious exercise of Santeria church members." *Id*. *Lukumi* stands for the proposition, not relevant here, that even a facially neutral law will be struck down if its effect is to target and prohibit certain conduct *solely* because of religion. *Lukumi* is particularly inapt here because the case does not address the balance, so critical here, between the Free Exercise Clause and the Establishment Clause.

In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), the Supreme Court addressed the constitutionality of the Missouri Department of Natural Resources' ("the Department") denial of a grant to the Trinity Lutheran Church Child Learning Center, a religious nonprofit that ran a daycare and preschool under the auspices of the Trinity Lutheran Church ("Trinity Lutheran"). The

Department "offer[ed] state grants to help public and private schools, nonprofit daycare centers, and other nonprofit entities purchase rubber playground surfaces made from recycled tires." *Id*. at 2017. "Trinity Lutheran applied for such a grant for its preschool and would have received one, but for the fact that Trinity Lutheran is a church [and] [t]he Department had a policy of categorically disqualifying churches and other religious organizations from receiving grants under its playground resurfacing program." *Id*. The Court concluded that the Department's policy violated Trinity Lutheran's rights under the Free Exercise Clause of the First Amendment because the policy "expressly discriminates against otherwise eligible recipients by disqualifying them from a public benefit solely because of their religious character." *Id*. at 2021. The Court concluded that the policy had the effect of conditioning eligibility for a government benefit on Trinity Lutheran renouncing its religious character and therefore the policy was subject to strict scrutiny review. *Id*. at 2024. There was no issue raised regarding what Trinity Lutheran would do with the grant money, i.e. whether it would be used for doctrinal religious purposes. The grant money would be used for a playground surface. The only possible basis for excluding Trinity Lutheran was because of its general religious character – quite unrelated to how it would use the government grant money.

In this case, Plaintiffs are not seeking an order prohibiting the State from partnering with faith-based agencies because they are religious. Plaintiffs seek an order prohibiting the State from partnering with faith-based agencies that allegedly use the money they receive from the State under the adoption contract to employ religious criteria to exclude same sex couples – something the State itself could not do – in performing those state services under contract with the State.

*Agency for Int'l Development v. Alliance for Open Society, Int'l, Inc.*, 570 U.S. 205 (2013) ("*AFOS*"), stands for the proposition that the government cannot impose a condition on the receipt of government funding that has the effect of regulating speech outside the funded program. St. Vincent has failed to explain how, assuming the truth of the allegations of Plaintiffs' Complaint, an Order precluding child placing agencies from using religious criteria in carrying out their State-contracted functions would "leverage[] the [] funding to regulate [St. Vincent's] speech outside the scope of the program." *AFOS*, 570 U.S. at 216. Plaintiffs allege in their Complaint that they do not challenge the manner in which St. Vincent expends private funds. And while St. Vincent denies that it uses any State funds in its recruitment process, this assertion impermissibly contradicts the allegations of the Plaintiffs' Complaint at this pleading stage, as discussed at length *supra*. As the Supreme Court observed in *AFOS*, the "relevant distinction . . . is between conditions that define the limits of the government

85

spending program – those that specify the activities Congress wants to subsidize – and conditions that seek to leverage funding to regulate speech outside the contours of the program itself."  570 U.S. at 214-15.  Here, assuming the veracity of the allegations of Plaintiffs' Complaint, St. Vincent fails to explain how any "limits" placed by the State on the child placing agencies' use of religious criteria in their performance under their adoption and foster care services contracts would seek to leverage St. Vincent's speech "outside the contours of the program itself."  *Id.* at 215.  At least based on the allegations of Plaintiffs' Complaint, *AFOS* does not support St. Vincent's Free Exercise argument.

St. Vincent's reliance on *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), is similarly misplaced.  St. Vincent submitted *NIFLA* to the Court in a supplemental notice (ECF No. 44), which the Court accepted in part and struck in part (ECF No. 45).  *NIFLA* involved a challenge to the California Reproductive Freedom, Accountability, Comprehensive Care, and Transparency Act ("FACT Act") which "require[d] clinics that primarily serve pregnant women to provide certain notices."  138 S. Ct. at 2368.  The Supreme Court noted that "the California State Legislature enacted the FACT Act to regulate crisis pregnancy centers."  *Id.*  The Court further noted that the legislative history revealed that these centers were "largely Christian belief-based" and "aim[ed] to discourage

and prevent women from seeking abortions." *Id.* (internal quotation marks and citations omitted). "To address this perceived problem [of discouraging women from seeking abortions], the FACT Act imposes two notice requirements on facilities that provide pregnancy-related services – one for licensed facilities and one for unlicensed facilities." *Id.* A licensed facility was required "to disseminate a government-drafted notice on site" that informed women that "California has public programs that provide immediate free or low-cost access comprehensive family planning services . . . and abortion for eligible women." *Id.* at 2369.

The Court began its analysis by explaining that "content-based regulations target speech based on its communicative content . . . [and] [a]s a general matter [] are presumptively unconstitutional . . . ." *Id.* at 2371 (internal quotation marks and citations omitted). The Court concluded that the centers were likely to succeed on their claims as to the licensed notice (the case was before the Court on a denial of a preliminary injunction) because those notices were content-based and compelled the centers to "speak a particular message" and "'alte[r] the content of [their] speech.'" *Id.* at 2371 (quoting *Riley v. National Federation of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)) (alterations in original). The Court continued:

> Here, for example, licensed clinics must provide a government-drafted
> script about the availability of state-sponsored services, as well as
> contact information for how to obtain them. One of those services is

abortion—the very practice that petitioners are devoted to opposing. By requiring petitioners to inform women how they can obtain state-subsidized abortions—at the same time petitioners try to dissuade women from choosing that option—the licensed notice plainly "alters the content" of petitioners' speech.

138 S. Ct. at 2371.

But nothing in Plaintiffs' Complaint suggests or requires the conclusion that St. Vincent would be required to disseminate any kind of scripted statement as a condition of partnering with the State to provide child welfare services. Again, St. Vincent asks the Court to assume facts not alleged in Plaintiffs' Complaint and to dismiss Plaintiffs' Complaint based on St. Vincent's assertion of what would occur if the Court were to grant the relief requested. This is not the appropriate stage of proceedings for the Court to address this argument. And if it did address it now, it would conclude that, based on the allegations of the Complaint, no such scripted, content-based restriction has been requested as relief.

In addition, St. Vincent has failed to distinguish *Teen Ranch, Inc. v. Udow*, 389 F. Supp. 2d 827 (W.D. Mich. 2005), *aff'd Teen Ranch, Inc. v. Udow*, 479 F.3d 403, 410 (6th Cir. 2017) (based on the "sound [and] clearly articulated" reasoning of the district court rejecting each of Teen Ranch's constitutional claims). *Teen Ranch* is instructive here. In *Teen Ranch*, the Michigan Family Independence Agency ("the FIA") had partnered for some time with Teen Ranch, a Christian faith-based

organization that provided residential care and services under contract with the FIA to abused, neglected and delinquent children who had been committed to or placed in the care of the FIA.  389 F. Supp. 2d at 829.  Of the 96 private child care agencies with whom the FIA contracted to provide residential youth services, 35 of whom were faith-based, Teen Ranch was the "the only provider that incorporate[d] its religious beliefs and teaching into the services funded under its contract with the FIA."  *Id*. When its last contract extension with Teen Ranch expired in October, 2003, FIA was concerned that continuing to enter into contracts with Teen Ranch that incorporated Teen Ranch's faith-based tenets and teachings in its provision of FIA services would violate the Establishment Clause, and FIA instituted a moratorium on all placements at Teen Ranch.  *Id*. at 830.  The moratorium caused Teen Ranch to close several of its programs and to sell half of its residential facilities.  *Id*.  Teen Ranch filed suit asserting several constitutional claims, including some of the same Free Exercise and Free Speech claims that St. Vincent's asserts here.

As the District Court phrased the issue: "Teen Ranch wants to be free to exercise its religious faith without interference from the State, and the FIA wants to avoid violating the Establishment Clause by subsidizing a particular religious viewpoint."  389 F. Supp. 2d at 831.  The district court first concluded, after a lengthy analysis rejecting Teen Ranch's argument regarding the import of the youths'

"private choice," that the direct funding of Teen Ranch by the FIA, continuing to incorporate Teen Ranch's faith-based teachings, would violate the Establishment Clause. *Id*. at 831-38. The district court then turned to Teen Ranch's argument that the FIA's refusal to renew its contract violated Teen Ranch's Free Exercise and Free Speech rights. The district court rejected Teen Ranch's argument that "the moratorium violates the Free Exercise Clause because it conditions the receipt of a governmental benefit on Teen Ranch's surrender of its religious beliefs and practices and burdens the free exercise of Plaintiff's religious beliefs without satisfying the strict scrutiny standard." *Id*. at 837-38. Dismissing Teen Ranch's reliance on cases holding that the government cannot deny a public benefit based on a recipient's religious beliefs, the district court held that: "Unlike unemployment benefits or the ability to hold office, a state contract for residential youth residential services is not a public benefit." *Id*. at 838. "[T]he State cannot be required under the Free Exercise Clause to contract with a religious organization." *Id*. In affirming the district court, the Sixth Circuit specifically affirmed the district court's conclusion that a state contract to provide services to delinquent and troubled youths whose care has been committed to the State is not a public benefit. 479 F.3d at 409. The district court further reasoned that "[t]he mere non-funding of private secular and religious school programs does not burden a person's religion or the free exercise thereof." 389 F. Supp. 2d at 838 (internal

quotation marks and citation omitted). The district court observed that "[t]he Free Exercise Clause's protection of religious beliefs and practices from direct government encroachment does not translate into an affirmative requirement that public entities fund religious activity simply because they choose to fund the secular equivalents of such activity." *Id*. (internal quotation marks and citation omitted.) The district court granted the FIA summary judgment on Teen Ranch's Free Exercise claim. *Id*. at 839.

The district court also rejected Teen Ranch's Free Speech argument: "The fact that FIA has decided to contract out some of its children's services responsibilities to private providers does not create a forum for private speech. The purpose of contracting for these services is to provide treatment for troubled youth in a residential setting, not to promote the private speech of the providers of that care." 389 F. Supp. 2d at 840. Again, in affirming the district court, the Sixth Circuit expressly affirmed this rationale. 479 F.3d at 410.

*Teen Ranch* suggests some principles that are important here. First, that a state agency seeking to provide child welfare services to wards of the State has no entitlement to a contract with the State to provide those services: "Unlike unemployment benefits or the ability to hold office, a state contract for [child welfare] services is not a public benefit [and] the State can[not] be required under the Free Exercise Clause to contract with a religious organization." 389 F. Supp. 2d at 838.

91

"[T]he mere non-funding of private secular and religious [] programs does not 'burden' a person's religion or the free exercise thereof." *Id*. (internal quotation marks and citation omitted) (second alteration added).  Second, a State's "decision to contract with private entities to deliver [public child welfare] services d[oes] not create, encourage or otherwise facilitate private expression, and accordingly the state c[an] make a content-based selection of private sector providers without violating the First Amendment."  *Id*. at 839.  As discussed *supra*, the Sixth Circuit affirmed the district court on both of these points. St. Vincent has not distinguished *Teen Ranch* and has not explained how these same principles do not defeat its First Amendment arguments here.

Much of St. Vincent's argument relating to its First Amendment claims relies on matters outside the pleadings that the Court cannot consider at this stage of proceedings and that in many instances directly contradict the allegations of Plaintiffs' Complaint.  In addition, St. Vincent has offered very little, either in its briefing or at oral argument, to distinguish *Teen Ranch*, which the Court finds instructive.  At this motion to dismiss stage, where the sole issues before the Court are whether Plaintiffs have alleged plausible Establishment Clause and Equal Protection Claims, St. Vincent cannot succeed on its First Amendment Free Exercise and Free Speech arguments.

**IV. CONCLUSION**

For the foregoing reasons, the Court DENIES the Defendants' motions to dismiss with the sole exception that the Court GRANTS the Defendants' motion to dismiss Plaintiff Jennifer Ludolph's claims on the basis that Ms. Ludolph has failed to establish standing to proceed with her claims.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: September 14, 2018

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on September 14, 2018.

s/Deborah Tofil
Case Manager